CLARK, RESPONDENT, *v.* AMERICAN DEVELOPING & MINING COMPANY, APPELLANT.

(No. 1,606.)

(Submitted June 17, 1903.   Decided July 14, 1903.)

*Mining Property—Sale—Optional Contracts — Rescission—Refunding Payments.*

Defendant gave plaintiff an exclusive option on certain mining property and placed him in possession. An installment becoming due, plaintiff expressed

dissatisfaction, and requested an extension of thirty days on the install-
ment, which was refused, and demand made for adherence to the contract.
Defendant insisted on the contract, and indicated no intention of abandon-
ing it.   After telegraphic communications relating to the transaction, de-
fendant demanded the deeds which had been placed in escrow ; and received
from plaintiff possession of the properties, terminating the contract.  Plain-
tiff claimed a return of installments previously paid, on the ground that
defendant had abandoned the contract, which contained no provision rela-
tive to the retention of installments, and of which time was the essence.
*Held,* that plaintiff was not entitled to a return of the installments, as it
did not affirmatively appear, from the contract of sale or in the agreement
to rescind, that the purchaser was to have payments made refunded.

*Appeal from District Court; Lewis and Clarke County; H.
C. Smith, Judge.*

ACTION by William J. Clark against the American Develop-
ing & Mining Company.   From a judgment in favor of plain-
tiff, and an order denying a motion for a new trial, defendant
appeals.   Reversed.

*Mr. F. W. Bacorn,* and *Messrs. Forbis & Evans,* for Appel-
lant.

Courts will look to the acts of the parties and to the surround-
ing circumstances to see which kind of a rescission they have
intended.   (*Hayes* v. *City of Nashville,* 80 Fed. 641; *Mayor*
v. *Refrigerating Co.,* 40 N. E. 771; *Winton* v. *Spring,* 18 Cal.
451.)

The rescission or modification of a contract, being in effect
the substitution of one contract for another, requires the same
meeting of minds as did the formation of the original contract.
(Bishop on Contracts, Sec. 812; *Peoples* v. *McTeer,* 14 S. E.
828; *Stex* v. *Roulston,* 15 S. E. 826.)

Time was of the essence of the contract by necessary impli-
cation.   (Lindley on Mines, Sec. 859.)

A rescission is not affected by an offer to rescind until the
offer is accepted.   (*Robinson* v. *Pogue,* 86 Ala. 257, 5 So. 685;
*Fripp* v. *Fripp,* 1 Rice (S. C.) Ch. 84; *Picot* v. *Douglas,* 46
Mo. 497; *Robinson* v. *Page,* 3 Russ. 114; *Murray* v. *Harvey,*
56 N. Y. 337; *Collins* v. *Baumgartner,* 52 Pa. St. 461; *Union
Loco. Co.* v. *Erie Co.,* 37 N. J. Law, 23; *Rodman* v. *Rodman,*

64 Ind. 65; *White* v. *Corlies*, 46 N. Y. 467; *Raysor* v. *Berkely Co.*, 2 S. E. 119; *McDonald* v. *Boeing*, 43 Mich. 394.)

If it be true that the contract was rescinded, the new contract of rescission superseded the old contract, and respondent must rely on the new contract; he cannot occupy an inconsistent position. (Bliss on Code Pleading, Sec. 122; *Union Loco. Co.* v. *Erie Co.*, 37 N. J. Law, 23; *Lloyd* v. *Brewster*, 4 Paige, 537; *Brown* v. *Mandeville*, 95 N. Y. 237.)

As a matter of law, even had this been a contract where the respondent was bound to buy, as appellant was bound to sell, instead of being, as it was, a mere option, a stipulation inserted to the effect that on respondent's default appellant would be entitled to retain the payments made, would have added nothing to the contract. (*Reddish* v. *Smith*, 38 Pac. 1003; *Glock* v. *Howard & W. Co.*, 123 Cal. 1; *Hansborough* v. *Peck*, 5 Wall. 497.)

The vendee has no right of action for what he has paid, on the termination of the contract in consequence of his default: (*Glock* v. *Howard & Wilson Co.*, 123 Cal. 1; *Hansborough* v. *Peck*, 5 Wall. 497; *Lawrence* v. *Miller*, 86 N. Y. 131; *Wheeler* v. *Mather*, 56 Ill. 241; *Frost* v. *Frost*, 11 Me. 225; *Grimes* v. *Goud* (Me.), 10 Atl. 116; *Hill* v. *Grosser*, 59 N. H. 513; *Axford* v. *Thomas*, 160 Pa. St. 8; *Patterson* v. *Murphy* (Neb.), 60 N. W. 1; *Nason* v. *Woodward*, 16 La. 216; *Thompson* v. *Kelley*, 101 Mass. 291; *McManus* v. *Blackman*, 47 Minn. 331; *Grant* v. *Munch* (Minn.), 55 N. W. 902; *Dukes* v. *Baugh*, (Ga.), 16 S. W. 219; *McAlpine* v. *Reisheneker* (Kan.), 42 Pac. 339; *Reddish* v. *Smith* (Wash.), 38 Pac. 1003; *Pease* v. *Baxter* (Wash.), 41 Pac. 899; *Soper* v. *Arnold*, L. R. 14 App. Cas. 429.)

Money paid on an option cannot be recovered back. (*Steel* v. *Bond*, 32 Minn. 14; Warvelle on Vendors, p. 832.)

*Messrs. H. G. & S. H. McIntire*, for Respondent.

When the rescission is had by mutual consent, or by the terms of the contract, or in consequence of the default of the vendor,

the vendee is entitled to recover whatever he has paid toward the purchase money, unless there is an agreement connected with the rescission which restricts its operation. (2 Warvelle on Vendors (2d Ed.), p. 1031, Sec. 869; 4 Wait's Actions and Defenses, 501; *Gillett* v. *Maynard,* 5 Johns. 85, s. c. 4 Am. Dec. 329; *Towers* v. *Barrett,* 1 T. R. 133; *Sheard* v. *Welburn,* 67 Mich. 367; *Christy* v. *Arnold,* 36 Pac. Rep. 918; *Tice* v. *Zinsser,* 76 N. Y. 549; *Graves* v. *White,* 87 N. Y. 464; *Lake Shore & M. R. Co.* v. *Richards,* 30 L. R. A. 44-45, and cases therein cited; *Lloyd* v. *David* (Ind.), 38 N. E. Rep. 232; *Bentley* v. *Evans* (Tex.), 29 S. W. Rep. 497; *Utter* v. *Stuart,* 30 Barb. 20; *Minah Consol. M. Co.* v. *Briscoe,* 47 Fed. 281; *Gay* v. *Alter,* 102 U. S. 79; *Andrews* v. *Hensler,* 6 Wall. 254; *Bohall* v. *Diller,* 41 Cal. 535; *Doughten* v. *Camden Co.* (N. J.), 7 Atl. 480; *Frink* v. *Thomas,* 20 Ore. 265; *Cleary* v. *Folger,* 24 Pac. Rep. 280; *Drew* v. *Pedlar,* 25 Pac. Rep. 749; *White* v. *Buell,* 27 Pac. Rep. 19; *Phelps* v. *Brown,* 30 Pac. Rep. 774; *Merrill* v. *Merrill,* 30 Pac. Rep. 542; *Joyce* v. *Shaffer,* 32 Pac. Rep. 320.)

MR. COMMISSIONER CALLAWAY prepared the opinion for the court.

This controversy arose over an option contract executed by the defendant, as party of the first part, to the plaintiff, as party of the second part, concerning the lease and sale of the Golden Sunlight group of mines. By the terms of the contract, which was dated January 31, 1894, the plaintiff, at his option, was to pay the defendant $500,000 as the purchase price of the property, in installments falling due at stated intervals; the last one being due October 1, 1896. A payment of $50,000 was due April 1, 1895. The plaintiff had the right to make any or all of the payments prior to the stipulated periods. It was provided that the defendant should deposit in escrow with the Montana National Bank deeds for the property, conveying all its right, title and interest therein to John E. Searles and

Samuel Thomas, or either of them, as directed by the plaintiff. Paragraphs four and five of the contract read as follows:

"(4) It is expressly understood that in the event of failure by the party of the second part, or by his associates or assigns, to make the payment of any of the installments upon the dates mentioned in this agreement, then and in that event the said deed or deeds, covering all of said mines, mining claims, lands and properties mentioned in said Schedule A, are to be returned to the said party of the first part; and peaceful possession of all of said mines, mining claims, lands and properties shall in that event be surrendered by the party of the second part, or by his associates or assigns, to the said party of the first part, together with all the improvements, appurtenances, machinery, mills and fixtures placed upon said mines, mining claims, lands and properties by the party of the second part, or by his associates or assigns, upon demand being made for such possession by the said party of the first part—it being further understood that, in the event of such failure to pay any of said installments as herein provided, and possession of said properties being demanded by said party of the first part, then and in that event all the said improvements, appurtenances, machinery, mills and fixtures placed upon said property by the said party of the second part, or by his associates and assigns, shall revert to the said party of the first part.

"(5) That upon the payment of $30,000 upon March 10, 1894, as herein provided, the party of the second part is to have immediate and undisturbed possession of all of said mining claims, lands and properties, with privilege to work the said mines, mining claims, lands and properties, to develop the same, and to mine and ship ores, and to receive the proceeds thereof, for the benefit of himself, or his associates or assigns; and the said party of the second part, his associates or assigns, are to receive all the product of said mines, mining claims, lands and properties for their own use, until failure occurs in the payment of any of said installments; providing, however, that the provisions of Section 6 of this agreement shall have first been

complied with. It is further understood that the party of the second part shall have the right to cut and use any trees upon said premises for improvements, or for mining purposes, or for fuel, in the operation of said properties."

Paragraph 6 provided that plaintiff should "diligently take the usual steps toward patenting such of said mining claims as are now unpatented," and should also expend from the net proceeds received from the shipments of ores between March 10, 1894, and October 1, 1894, the sum of $40,000 in the erection of reduction works and the necessary equipment for conducting mining on said property.

Plaintiff was to have the use of all mining machinery and appliances then on the property, which were to be transferred as a part thereof.

In pursuance of this contract the plaintiff entered into possession of the premises and property on March 10, 1894, and continued in possession until April 2, 1895. At plaintiff's direction, defendant executed and placed in escrow deeds to the property mentioned in the contract, by the terms of which deeds the property was conveyed to John E. Searles. Subsequent to the execution of the contract Searles acquired an interest in it from the plaintiff, and the principal part of the money required to make the improvements spoken of and the payments mentioned below was advanced by him. While plaintiff was in possession of the premises he mined and extracted therefrom ores of the aggregate value of $83,110.27, the net proceeds of which were invested in the property, for the purpose of developing and improving the same, and in the cost of mining and extracting said ores. The defendant did not admit that such expenditures were wisely incurred, or that the mines were operated to the best advantage. Plaintiff made the first four payments provided for in the contract, amounting to $165,000. On March 28, 1895, the condition of the mine being disappointing to plaintiff, he applied to defendant for thirty days' grace in which to make the payment due April 1st following. March 29th the trustees of defendant held a meeting, at which it was

resolved that they "do not accept the modification asked, and that the agreement of January 31, 1894, with W. J. Clark, for sale of the Golden Sunlight group to John E. Searles, be adhered to."

The following telegraphic messages were then sent and received on the dates indicated therein:

"New York, March 31, 1895. To Bernard MacDonald, care American Developing & Mining Co., Butte, Montana: My principal dissatisfied with recent reports from the mine; but, if thirty days' extension granted, he will go out and investigate personally, and I hope to persuade him to go on. Answer, care Ballou, 10 Wall Street. Wm. Clark."

"Butte, Mont., March 31, 1895. · Wm. J. Clark, Care Ballou, 10 Wall Street, New York: Default, restore property to company, and we will treat honorably with your principal. Bernard MacDonald, Pres't."

"New York, April 1, 1895. To Bernard MacDonald, Care American Developing & Mining Company, Butte, Mont.: Principal refuses to go to Montana unless extension granted. You stand with me. Think we can carry this through. You will find us honorable. Answer. Wm. J. Clark."

"Butte, Mont., April 1, 1895. To Wm. J. Clark, Care Geo. W. Ballou, 10 Wall Street, New York: Company cannot grant your request. Your principal is hereby assured of honorable treatment if default is made. Bernard MacDonald, Pres't."

"Butte, Mont., April 1, 1895. To John E. Searles, 117 Wall Street, New York: Replying to Clark's telegraphic solicitation for thirty days' grace on April payment, we wired him that would not be granted; but, if default was made, we would "deal honorably with his principal. Reassuring you on this point, and that the property is one of the most valuable in Montana, we ask you to investigate mines and past management, promising you equitable treatment in case you then desire reconstruction: Bernard MacDonald, Pres't."

The plaintiff had cognizance of the telegram to Searles. It was never answered. All of the messages sent by defendant

were received in New York City on the same days they were dated and prior to the close of business by the bankers of that city on the respective days when received. No further or other communications were had between the plaintiff and defendant after April 2, 1895, as shown by the record.

Searles was able to pay the sum of $50,000 on April 1, 1895, but neither he nor plaintiff ever made the payment due on that day. April 2, 1895, the defendant demanded and received from the Montana National Bank the deeds which had theretofore been placed in escrow, and on the same day demanded and received from the plaintiff possession of the properties therein described, thereby terminating the contract.

May 19, 1896, William J. Clark, the plaintiff, began this suit, claiming that the defendant had rescinded and abandoned the contract to which the plaintiff consented; but, notwithstanding such rescission and abandonment, the defendant had failed and refused to repay him the sum of $165,000 theretofore paid on the contract. Plaintiff prayed judgment against defendant for that sum, together with interest thereon at the rate of 10 per cent. per annum from April 2, 1895, and for costs of suit.

Defendant answered, denying that it had rescinded or abandoned the contract, but admitted that it refused to repay the sum of $165,000, or any part thereof. Then followed this allegation in the answer: "And defendant says that the plaintiff failed and refused, and still fails and refuses, to pay to it the sum of $50,000, which by the terms of the contract in the complaint set forth became due and payable on April 1, 1895, and failed and refused, and still fails and refuses, to pay to the defendant any sum of money whatsoever; that on the 1st day of April, 1895, defendant was, ever since has been, and now is ready, able and willing to proceed with the aforesaid contract, upon the payment by the plaintiff to it of the sums in the said contract specified to be paid by the plaintiff to the defendant."

All of the foregoing appears from the pleadings and statement of facts agreed to by the parties, upon which the trial was had. The court rendered judgment for the plaintiff in accord-

ance with the prayer of the complaint. Defendant moved for a new trial, which was denied. From such judgment, and the order denying the motion for a new trial, defendant prosecutes this appeal.

Rescission is the unmaking of a contract, requiring the same concurrence of wills as that which made it, and nothing short of this will suffice. (Bishop on Contracts, Sec. 812; *Robinson* v. *Pogue,* 86 Ala. 257, 5 South. 685.) There is a wide difference between the rescission of a contract and its mere termination or cancellation. (*Winton* v. *Spring,* 18 Cal. 452; *Weil* v. *Jones,* 53 Cal. 46.) "It is well settled that a technical rescission of the contract has the legal effect of entitling each of the parties to be restored to the condition in which he was before the contract was made, so far as that is possible, and that no rights accrue to either by force of the terms of the contract. But, besides technical rescission, there is a mode of abandoning a contract as a live and enforceable obligation which still entitles the party declaring its abandonment to look to the contract to determine the compensation he may be entitled to under its terms for the breach which gave him the right of abandonment." (*Hayes* v. *City of Nashville,* 80 Fed. 641.) "Such an abandonment is not technically a rescission of the contract, but is merely an acceptance of the situation which the wrong-doing of the other party has brought about." (*Anvil Mining Co.* v. *Humble,* 153 U. S. 540, 14 Sup. Ct. 876, 38 L. Ed. 814.)

Did the parties intend to rescind the contract, so as to place each other *in statu quo?* In determining whether such a rescission has taken place, courts look, not only to the language of the parties, but to all the circumstances, including the effect of a complete rescission upon the rights of those concerned, and the probability or improbability of their having desired to effect such a result. (*Hayes* v. *City of Nashville,* 80 Fed. 641, 26 C. C. A. 59.) We have seen that the plaintiff asked for thirty days' grace on March 28th in which to make the payment due three days later; that the defendant refused the request, demanding adherence to the contract; and that plaintiff then sent

the telegram of March 31st, saying his principal was dissatisfied with the reports from the mines, but, if thirty days' extension be granted, his principal would "go out and investigate personally," and plaintiff hoped "to persuade him to go on." This was tantamount to saying that, if the thirty days' extension be not granted, the payment would not be made. Then followed the telegram in which defendant said, "Default, restore property to company, and we will treat honorably with your principal."

It was quite natural for the defendant, in case the plaintiff abandoned the contract, to desire an immediate and peaceable possession of the premises. Common experience has taught that, while the peaceable possession of leased premises is promised to the lessor, it often happens that he has to resort to legal process in order to repossess himself of the property, and finds that after default has been made, and before he regains possession, much valuable property in the nature of fixtures has disappeared.

There was no promise of honorable treatment held out to plaintiff in the telegram just quoted. The promise of honorable treatment was to his principal. The defendant must have assumed that the plaintiff would be unable to proceed, and assurance was made that, in case plaintiff made default and restored the property, defendant would deal honorably with Searles, the man to whom the deeds were made, and who had furnished the principal part of the money. The language of the telegram excluded plaintiff from consideration. Plaintiff evidently so read it, for he replied: "Principal refuses to go to Montana. *You stand with me.* Think we can carry this through. You will find us honorable." The defendant remained obdurate. It said: "Company cannot grant your request. Your principal is hereby assured of honorable treatment if default is made." And, concluding the correspondence, observe the telegram sent to Searles, telling him the company would not grant any further time in which to make the payment due April 1st, assuring him of honorable treatment, of the value

of the property, asking him to investigate the mines and past management, and promising him equitable treatment in case he desired a "reconstruction." The inducements, if any were held out, were to Searles, and none whatever were made to plaintiff. He was excluded in no uncertain terms. The suggestion that Searles investigate the past management of the mines was by no means flattering to plaintiff. As to whether Searles ever did desire a "reconstruction," the record is silent. So far as we are able to tell, the defendant may have accorded to him the honorable treatment promised. He may be well satisfied. He is not a party to this suit, and there is no showing that Clark is acting in his behalf, or has succeeded to his rights in the premises.

It is apparent that Clark was merely Searles' agent, and as such agent he has no right to recover his principal's money. No communications between plaintiff and defendant appear after April 2d. No further action by plaintiff appears until May 19, 1896, when he commenced this suit. We are forced to the conclusion that under no phase of the case was any inducement held out to plaintiff, nor can we see, from anything in the record, any intention on part of defendant to rescind the contract. On the contrary, it stood upon the contract, insisted upon it, and the only inducement held out, if any there was, was the assurance of honorable treatment to Searles, and a "reconstruction" of the contract, should he desire it; and with this, as we have seen, plaintiff has in no way connected himself.

This view is strengthened when we examine the nature of the contract. The parties were dealing with property subject to "sudden, frequent and great fluctuations in value." (*Waterman* v. *Banks*, 144 U. S. 394, 12 Sup. Ct. 646, 36 L. Ed. 478.) They entered into a contract respecting its working and sale. The defendant gave the plaintiff the exclusive right to purchase within the time limited in the contract, and placed him in possession, giving him the use of its mining machinery, the right to cut and use its timber, and to work the mines and ex-

tract the ores therefrom as he should see fit. It took the risk of having its property ruined by unskillful work, and deprived of its most valuable ore bodies. When the mining property was leased, its showing of values was so great that plaintiff was willing to agree to $500,000 as its purchase price. In the vicissitudes of mining this showing might have disappeared before the plaintiff had made the second payment, and he could have exercised his election to abandon the property at once. For these risks the defendant exacted certain payments. Without doubt these payments were required in the nature of an indemnity or of compensation.

The plaintiff on his part entered upon a mining venture—an enterprise fraught with hazard, but holding out the promise of rich returns. He took the risk of losing his investment, but presumably it was his expectation to extract from the mine more than sufficient to pay its price, and it was entirely within the realm of probability that he would uncover ore bodies worth millions with his first few months of operation. In this event he could hold defendant to its bargain. It could not repudiate the contract, as the plaintiff could. The plaintiff could enforce the specific performance of the contract by complying with its terms, but the defendant could not. Practically it had fulfilled all the conditions imposed upon it. Deeds conveying title to the property were in the bank.

The contract was unilateral, and by its express terms time was of its essence. "There is a decided distinction between an option to purchase, which may be exercised or not by the prospective purchaser, and an absolute contract of sale, wherein one of the parties agrees to sell and the other to buy certain property, the sale to be completed within an agreed time. In the latter case, of course, the mere lapse of time, with the contract unperformed, does not entitle either party to refuse to complete it, and therefore time is not of the essence of the contract. But where the contract is merely an option, generally without consideration, and especially as applied to mining property, of course, as pointed out in the last preceding sections,

time is of its essence, and the prospective purchaser must act promptly within the time specified, or his right to purchase is gone." (Snyder on Mines, Sec. 1378. And see Lindley on Mines, Sec. 839; *Settle* v. *Winters,* 2 Idaho, 215, 10 Pac. 216; Pomeroy on Contracts, Sec. 387; Fry on Specific Performance, 3d Ed., Sec. 1052.)

Whether partial payments made under absolute contracts of sale can be recovered by the prospective vendee upon a rescission of the contract is a question upon which the authorities are somewhat divided; but as to option contracts generally the rule is thus stated in Warvelle on Vendors, Sec. 824: "An option of purchase rests on different grounds, and is governed by different rules, from those which obtain in case of bilateral contracts. Where the time for acceptance is not limited, it must, if given for a consideration, remain open for a reasonable time, to be determined by all the circumstances of the case; but if the option reserved is to purchase at any time before a certain day for a certain sum, to be paid on demand for deed, time is of the essence of the contract, and equity cannot relieve after the time, nor require the repayment of money paid to secure the option." And we think that because of the peculiar conditions surrounding contracts for the sale of mining property, where the contract is unilateral, or in the nature of an option, providing for partial payments upon the purchase price at stated times, it is the manifest intention of the parties that the vendor shall retain all payments made, unless it is directly specified to the contrary; and although the contract be mutually rescinded, unless it affirmatively appears from the contract of sale, or in the agreement to rescind, that the vendee is to have the payments made by him refunded, he cannot recover them.

In this case plaintiff contends that, as there is no provision in the contract authorizing defendant to retain the payments, it may not do so. In addition to what we have said above, we quote the following from *Reddish* v. *Smith,* 10 Wash. 178, 38 Pac. 1003, 45 Am. St. Rep. 781, in which a similar argument was made: "We do not think this is a legitimate construction

of the contract. While it is true that the courts will not supply language to create a forfeiture, where the forfeiture is not specially provided for by the parties themselves, yet it seems to us that it was the clear, unequivocal intention of the parties to this contract, as expressed by the contract, that the payments made by the appellants should be forfeited, in case the respondents elected so to do, upon the nonperformance of the contract by the appellants. The option of forfeiture is for the benefit of the vendor; but it would be difficult to conceive what benefit would accrue to the vendor in a case of this kind, if he were not allowed the benefit of the payments which had been made." And in *Lawrence v. Miller,* 86 N. Y. 131, it is said: "The plaintiff in the action before us sues for the whole amount of the money paid by the vendee. The defendant came by it rightfully, in pursuance of a contract lawfully made, between competent parties. He has made no breach of that contract. He has failed in no duty to the vendee. Wherefore, then, should he give up that which was rightfully his own? When and whereby did it cease to be his, and to be due to the vendee? If the contract had been kept by both parties, the money paid would still be his of right."

Another insuperable obstacle appears in the way of plaintiff's recovery. Under the general rule, following the rescission of a contract for the sale of real estate, the parties must be placed practically *in statu quo.* How can the defendant be placed *in statu quo* if the $165,000 be returned to plaintiff? The ore bodies which were in place in the mine when the plaintiff took possession have been exhausted to the extent of $83,110.27. Whether the plaintiff's working benefited the mine in any particular is not disclosed by the record. It is not necessary to discuss this subject further.

We are therefore of the opinion that the judgment and order should be reversed, and the cause remanded for a new trial.

PER CURIAM.—For the reasons given in the foregoing opinion, the judgment and order are reversed, and the cause is remanded for a new trial.