F. W. RAMPTON, Appellant, v. G. L. DOBSON, Treasurer of POLK COUNTY, IOWA, Appellee.

**Taxation:** LAND CONTRACTS. A written agreement to purchase real property and to pay therefor a stated sum at specified times, a portion of which was paid on the execution of the agreement, and with right of forfeiture in case of default, constitutes a binding contract which is taxable to the vendor, and is not a mere option to purchase. The agreement in this case as written and under the construction placed upon it by the parties at the trial is held to constitute an enforceable contract.

**Same:** OPTION AGREEMENTS. An option to purchase real estate is not a sale, nor is it an agreement to sell; but is simply a continuing offer, which must be accepted before it will become an enforceable contract.

Evans, J., dissenting.

*Appeal from Polk District Court.*—HON. LAWRENCE DE GRAFF, JUDGE.

SATURDAY, JUNE 8, 1912.

THIS is an appeal from an assessment of omitted moneys and credits. Plaintiff was assessed by the treasurer of Polk County with omitted credits to the amount of about $15,000, and from such assessment appealed to the district court. Upon trial in that court the assessment was confirmed, and plaintiff appeals.—*Affirmed.*

*W. L. Smith* and *E. P. Hudson,* for appellant.

*Hewitt, Miller & Wallingford,* for appellee.

DEEMER, J.—The land contract upon which the assessment was based was entered into between Rampton, party of the first part, and Milne & Milne, party of the second part, on October 29, 1907. It is an ordinary contract for the sale of certain lands in Benton county, Iowa, for the agreed consideration of $34,560; the agreement of the first parties being to sell to the parties of the second part on performance of the agreements of said second parties by good and sufficient warranty deed the premises described. The agreement of the second parties was as follows:

1. TAXATION: land contracts.

And the said party of the second part in consideration of the premises, hereby agree to and with the party of the first part to purchase all his right, title and interest in and to the real estate above described for the sum of thirty-four thousand five hundred sixty dollars, and to pay said sum therefor to the party of the first part, his heirs, or assigns as follows: Nine hundred 00-100 dollars on the execution of this agreement, and the party of the first part hereby acknowledges receipt of the same. Thirty-three thousand six hundred sixty dollars in two payments, to wit: First payment, 1st day of March, 1908, $28,660.00 cash, and by assuming a mortgage of $5,000.00 now against the premises with interest thereon from March 1, 1908, all subject to a lease between first party and Powell Bros., expiring March 1, 1909, which is to assign to second parties on March 1, 1908, with rent notes for the year 1908. Second party will insure the buildings on the premises and if buildings should be damaged or destroyed by fire prior to March 1, 1908, second party shall be entitled to insurance collected and shall accept same in full of damages done to premises. With interest from this date at the rate of —— per cent per annum on all sums as shall remain unpaid, until all is paid, payable at Dysart Savings Bank, Dysart, Iowa.

And the agreement further provides:

And it is expressly agreed by and between the parties hereto that the time and times of payment of said sums of money, interest, and taxes as aforesaid is the essence and im-

portant part of the contract, and that if any default is made in any of the payments or agreements above mentioned to be performed by the party of the second part in consideration of the damage, injury and expense thereby resulting or that may be incurred by or to the party of the first part hereby, this agreement shall be void and of no effect, and the party of the second part shall have no claim in law nor equity against the party of the first part, nor to the above-mentioned real estate, nor any part thereof; and any claim, or interest, or right, the party of the second part may have hereunder up to that time by reason hereof or if any payments and improvements made hereunder, shall, on all such default, cease and determine, and become forfeited, without any declaration of forfeiture, re-entry, or any act of the party of the first part. And if the party of the second part or any other person or persons, shall be in possession of said real estate, or any part thereof, he or they will peaceably remove therefrom, or in default thereof, he or they may be treated as tenants holding over unlawfully after the expiration of a lease, and may be ousted and removed as such. But if such sums of money, interest, and taxes are paid as aforesaid, promptly at the times aforesaid, the party of the first part will, on receiving said money and interest, execute and deliver, at his own cost and expense, a warranty deed of said premises as above agreed. Possession reserved until March 1, 1909.

On the face of it, this contract was taxable as moneys and credits under a long line of authorities. See *Talley v. Brown,* 146 Iowa, 360, and cases cited. But, to avoid its listing for taxation, Rampton and one of the Milnes took the stand and gave testimony which it is claimed shows that the contract was not taxable because it was a mere option. That we may have the testimony before us, we here quote: Rampton testified, in substance:

Made a contract with Mr. Milne to sell the farm the 1st of March. $900 was paid. Q. In case of nonpayment of the purchase price the 1st of March, what, if anything, was to happen? A. I was to still hold the farm. Q. This money that was to be paid, what was to be done with that? A. It was to be forfeited. . . . At the time of signing

the contract to sell the farm to G. H. Milne and J. S. Milne,
$900 was paid. The balance was paid according to the
terms of the contract shortly after March 1, 1908, and deed
was executed to these parties in March, 1908. . . . I
paid the taxes on the farm for 1906 and 1907. Mr. Milne
paid the taxes for 1908 which became due January 1,
1909. He took possession of the farm in March, 1908, after
the deal was closed up. . . . The place had been in-
sured, and just run out, and I told him it would not pay
me to get it insured. I was responsible for the building
up to the 1st of March, because I owned the farm up to
the 1st of March. I supposed if the buildings burned he
would not want to take the farm without me losing the
buildings. I supposed he expected to take it. . . . Q. Do
you wish the court to understand that Milne and his
brother and yourself entered into a contract in good faith,
which provided in substance that you were to receive from
Milne the sum of $900 that you were to keep, that you
were to give them any and all right that you might have
in the proceeds of the insurance policy on the premises if
the improvements would burn prior to the 1st day of March,
1908, and after the signing of the contract, and that you at
the same time would have no right under the contract to
compel Mr. Milne or his brother to carry out the provisions
of them if they didn't want to? A. Provisions of taking the
place? Q. Yes. A. No, I could not compel them to take
the place. Q. That is what you wish the court to under-
stand? A. Yes, sir. Q. You were to keep the $900 in
that event and not give them any part of it? A. That,
according to contract. Q. They were willing to give you
$900 simply for the right to buy on March 1, 1908? A.
Yes, sir. Q. Without any rebate if they decided not to
buy? A. Yes, sir. I came right home and never saw the
Milnes until I went back the 1st of March. . . . Re-
ceived the purchase price on the farm on the 1st of
March or thereabout, A. D. 1908.

Milne gave this testimony:

My brother and I bought Mr. Rampton's farm October
29, 1907, made the first arrangements for the purchase at
Dysart. Found Mr. Rampton at his sister's at Dysart,
talked the matter over there, and went uptown and drew

up the contract.    Henry Mohler, cashier of the Savings
Bank, drew up the contract. . . . Q. What was said or what
was your understanding, in regard to this $900 that was
paid, in case you failed to make further payments the 1st
of March?    A. The way I took it, we was to lose it if we
didn't make the terms.    Q. You was to lose it?    A. That
is the way I had it figured out.    Q. And if you made the
payment according to the terms, that was to apply on the
purchase price of the farm?    A. Yes, sir.    We got posses-
sion of the farm March 3, 1908, when we got the deed.
We paid the money and got the deed March 3, 1908.    Ramp-
ton paid the taxes due the 1st of January, A. D. 1908.
The place was rented for a year and we got possession sub-
ject to the one year lease. . . . We talked over the
terms first at the house, and then with Henry Mohler
when he drew the contract.    $900 was paid cash; the
balance, the following March.    Did not have the money on
hand to pay for the farm.    We borrowed a good part of
it.    We made arrangement to borrow the money to pay
for the farm along in February.    Did not make any ar-
rangement in October, November, or December.    Did not
ask anybody to loan us money at that time.    Q. When you
signed this contract, you agreed to it, didn't you, to buy
the farm?    A. In one way we did; if we could not meet
it, we had a right to forfeit that.    Q. I am asking if in
the contract you did not agree to buy the farm, and didn't
Mr. Rampton agree to sell the farm to you?    A. Yes, he
did; but at the same time we had a right to forfeit.    Q. I
am asking if you did not agree to buy it by signing the
contract.    When you signed that contract, and your brother
signed it, when you paid the $900, it was your intention
to carry it out, wasn't it?    A. Yes, it was our intention.    Q.
You had no other intention?    A. That was our intention.
But at the same time, if we did not do it, we had a chance
to forfeit the $900 and let it go.    Q. What was said about
forfeiting the $900 if you did not?    A. If we didn't take
the place, that was the last of it.    Q. Who said that?    A. I
think the contract did.    Q. Who else said that?    Did Ramp-
ton tell you before the contract was written that was to
be the understanding?    A. It was the understanding between
the three of us when he drew it up.    Q. How did you reach
that understanding?    What was said about it?    That is

what I want to know. A. Because he wanted some kind of a bond he would get something out of it if we didn't take it. Q. You had paid $900, and he was to keep it if you didn't carry out the contract? A. That is the way I understand it. Q. But you intended at the same time always to carry out the contract? A. Yes, intended to if we could. Q. You know that if there had been a fire at any time after October 29, 1908, that you and your brother would have been entitled to the proceeds of the insurance policy, don't you? A. If we took the place. Q. You knew you would have been entitled to it? A. If we had took the place we would have; if we didn't, I don't suppose we would. Q. Didn't you understand this part in case insurance money was paid by reason of a fire having occurred in case it was paid to you at any time ahead of March 1, 1908, and you didn't take the farm, that you would pay all of the insurance money to Rampton, and he would keep your $900, and you would be out the insurance money and be out the $900, was that your understanding? A. That was the way I understood it, yes. Q. Did you have the money on hand with which to pay for the farm when the contract was signed? A. Had to borrow a large part of it in the spring. We figured on selling another place we had in Tama county, and didn't get that sold. In case we could not have borrowed or sold, we would have had to forfeit the $900. There would have been no other way out of it.

This is the entire record, and it will be noticed that there is no testimony of any mistake in the drafting of the contract. The parties say it is just as they intended

2. SAME: option agreements.

it to be, and about all they attempt to do in their testimony is to put a legal interpretation upon it. They say that, if the Milnes did not make the final payment, the $900 was to be forfeited; but, if they did, it was to be part of the purchase price. They do not say, nor could they, that this was a mere option secured by the Milnes. As a legal conclusion, they say that Rampton could not have enforced anything but a forfeiture; but this legal conclusion is not binding upon us. There was a bind-

ing contract of sale which Rampton might have enforced at any time by suit, or at his election, if the Milnes did not make the deferred payment—he could retain the $900 and still keep his land.   An option of the seller to enforce his contract or to rely upon a penalty for noncompliance is something quite different from an option on the part of the buyer.   In the one case there is a sale or valid agreement to sell, and in the other a mere option on the part of the buyer to buy or to enter into a contract of purchase.   An "option" is not an actual or existing contract, but merely a right reserved in a subsisting agreement.   It is a continuing offer of a contract, and if the offeree decides to exercise his right to demand the conveyance or other act contemplated, he must signify that fact to the offerer.   *Rivers v. Sugar Co.,* 52 La. Ann. 762, 27 South. 118; *Sizer v. Clark,* 116 Wis. 534 (93 N. W. 539).   An option is not a sale.   It is not even an agreement for a sale.   At best it is but a right of election in the party securing the same to exercise a privilege, and only when that privilege has been exercised by acceptance does it become a contract to sell.   *Hopwood v. McCausland,* 120 Iowa, 218.   "An option is nothing more than a continuing offer to sell; but until it is accepted it does not become a contract of sale, for it lacks the element of an agreement between the minds of the parties.   It is only when there has been an acceptance of a proposal to sell that the vendee becomes in any sense the equitable owner of the subject-matter of the option." *Milwaukee Mechanics' Ins. Co. v. R. S. Shea & Son,* 123 *Fed.* 9, 11 (60 *C. C. A.* 103).   "There is a decided distinction between an 'option' to purchase, which may be exercised or not by the prospective purchaser, and an absolute contract of sale, wherein one of the parties agrees to sell and the other to buy certain property; the sale to be completed within an agreed time.   In the latter case the mere lapse of time with a contract unperformed does not entitle either party to refuse to complete it, and therefore

time is not of the essence of the contract; but where the contract is merely an option generally, without consideration, and especially as applied to mining property, of course time is of the essence." *Clark v. American Developing & Mining Co.,* 28 Mont. 468 (72 · Pac. 978, 981), citing Snyder, Mines, section 1378.

    The cases differ from *In re Shields,* 134 Iowa, 559, in that the parties to the contract both testified in that case that all they intended, understood, or agreed upon was an option, and that they so informed the scrivener, and supposed he had so written the contract. Upon their testimony a court of equity would have reformed their contract. Not so here. No court would have been justified, on the testimony adduced, in reforming the contract between Rampton and the Milnes. In so far as shown, it was written just as the parties intended, and all they ask the court to do is put such a legal interpretation upon the contract as they think it will bear. The *Shields* case does not hold that the contract is a mere option, but proceeds wholly upon the thought that, under the testimony, the parties intended to create a mere option, and that by mistake of the scrivener it was not so worded. The testimony in such a case should be clear, satisfactory, and conclusive, and of such import as to justify a reformation. That does not appear here. That the vendor might enforce the contract, notwithstanding the provision for forfeiture, is well established by the authorities. See *Wilcoxon v. Stitt,* 65 Cal. 596 (4 Pac. 629, 52 Am. Rep. 310); *Higbie v. Farr,* 28 Minn. 439 (10 N. W. 592); *Rourke v. McLaughlin,* 38 Cal. 196; *Mason v. Caldwell,* 5 Gillman (Ill.) 196 (48 Am. Dec. 330); *Moore v. Smith,* 24 Ill. 512.

    The trial court correctly sustained the assessment.

    The judgment should therefore be—*Affirmed.*

    EVANS, J. (dissenting). I. I am of the opinion that the majority holding is in conflict with the former holding

of the court in the case *In re Shields Bros.*, 134 Iowa, 559.
An examination of the opinion in the *Shields Bros.* case
will not, in my opinion, justify the distinction which pur-
ports to be made in the majority opinion.

It so happens that, in the written contract in the case
before us, the same blank printed form was used as was
used in the *Shields Bros.* case, so that the two written con-
tracts are identical in their general nature and in the form
of their undertakings. Both parties to the contract involved
in the present case testified as witnesses as to the real un-
derstanding between the parties to the contract. It is said
in the majority opinion that this testimony is a mere inter-
pretation of the written contract by the parties. If this be
so, it is precisely what was contended for by the appellants
in the *Shields Bros.* case, as will appear from the following
statement of the issue as made in the opinion in such case:
"Shields Bros. appeared before the treasurer pursuant to
notice, and, in writing, objected to an assessment on the
grounds: First, that the contract between the parties, as
evidenced by the writing and by the facts and circumstances
attending the making thereof, was not intended or under-
stood to be a contract of sale, or one creating an absolute
indebtedness; that, on the contrary, it was a mere option,
giving Flynn the right to purchase in the future on the
terms and conditions specified, and that it was so intended
and understood by the parties thereto. Second, that an
assessment based on said contract as an item of credit would
result in double taxation. And it was upon the issues as
thus outlined that the case was tried below and is now
presented in this court." 134 Iowa, page 561.

It will be seen from the foregoing that the appellants
in that case based their appeal upon the contract between
the parties "as evidenced by the writing" and by the "facts
and circumstances attending the making thereof." There
was no claim made of a mistake in the writing. The
parties to the contract were agreed in their construction of

it and acted upon such construction. And all this must be said also in the case at bar. The following comprises all the rest of the discussion and holding of this court in the *Shields Bros.* case:

The hearing was had in the district court as in equity, and on such hearing the appellants brought into the record proof of the circumstances attending the making of the contract. Each of the respective parties to such contract were called to the stand, and over objections as to competency, etc., testified that it was their understanding that a mere option to purchase was all that was in contemplation and being granted; that they informed the scrivener that such was their contract, and supposed he had so written. A contract rests in the intention of the parties thereto. It is true by general rule that, where the contract has been committed to writing, the nature and extent of the undertakings must be ascertained by an inspection of such writing. Oral evidence is not allowable to work a change or variance in the terms, conditions, etc., as fairly expressed by the writing. But this rule is enforced only where a controversy arises between the parties to the contract or their privies. As against a stranger to the contract, a party thereto may assert that the agreement was other or different —in any respect and to any extent—than that which the writing imports. *Livingstone v. Stevens*, 122 Iowa, 63; *Logan v. Miller*, 106 Iowa, 511; *Roberts v. Bank*, 8 N. D. 474 (79 N. W. 1049); 11 Am. & Eng. Ency. 548, note; Page on Contracts, section 1196 et seq. Now, it may be doubted if the writing here in question imports a sale. In terms the agreement is for a sale, not an agreement of sale. There was to be no change in possession in virtue of the contract, and the appellants were to pay the taxes on the lands for the current year. Moreover, if Flynn failed to present himself on March 1st, following, and make payment etc., the money paid as of the date of the contract was to be regarded as forfeited, and all his rights should at once and without action on the part of appellants cease and determine. But however this may be, we must treat the contract as one granting only the right to exercise an option. The parties to it so intended and understood; and, as we have seen, all other parties are concluded from asserting

that it was other or different. And as against a stranger, it is not necessary that the writing be reformed in an action brought for that purpose before the real contract can be asserted and made the basis of a recovery or defense. *Logan v. Miller, supra.* Now, an option is not a contract to pay. It creates no enforceable indebtedness on the part of the person to whom it is granted. *Hopwood v. McCausland,* 120 Iowa, 218; Warvelle on Vendors, section 125. And, this being true, there can not arise out of such a contract a taxable credit within the meaning of the tax laws of the state. 134 Iowa, 561-563.

It will be noted from the foregoing that grave doubts were expressed by this court as to whether the form of written contract, adopted, amounted to anything more than an option. This only emphasizes the reasonableness of the attitude of the parties herein in putting an agreed construction upon the contract. There is no claim of fraud or collusion. The evidence on behalf of the appellee is undisputed and unimpeached either in its facts or its motive. The conduct of the parties with reference to the contract, after it was entered into, was consistent with their present claim, and that, too, in a very substantial and significant sense. The contract in question was entered into in October. Under the statute the taxes for the ensuing year became a lien upon the property on the last day of December. The appellant, as owner of the land, paid these taxes for which he was in no manner liable if the October contract amounted to a sale.

II. I disagree, also with some emphasis, with the last paragraph of the majority opinion. It is there held that the testimony in such a case as this "should be clear, satisfactory, and conclusive, and of such import as to justify a reformation." Such is the kind of testimony which must be produced in order to justify a reformation as *between the parties to the contract.* If the same rule is to be applied as between a party to the contract and a third party, then the distinction pointed out in the *Shields Bros.* case

is wholly ignored. It is there held especially that the existence of a written contract between two parties does not preclude oral evidence to contradict it as between one of the parties and a third party. Such oral evidence is admissible for the all-sufficient reason that the parties to the suit are not the parties or privies to the contract. It is not essential, in such a case, that it be shown that the written contract is reformable as between the parties thereto.

Of course, if any question of fraud or collusion were involved or if the evidence were conflicting, the court, as a trier of fact, might properly give greater weight to the written contract and find the facts in accord therewith. But no question of that kind is involved here. The appellee introduced no evidence in the court below and has submitted no argument here. I think, therefore, the case is ruled squarely by the former case.

I should have less objection to the majority opinion if the *Shields* case were frankly overruled therein. As between the two, however, I think the *Shields case* reached a more equitable result. The contrary holding is not wholesome in its practical operation. We can hardly fail to take judicial notice of the universal custom which obtains in the sale of farm lands, viz., that the contracts are always made with a view to consummation on the 1st of March following. December 31st usually intervenes between the date of contract and the date of consummation, and the practical effect of the present holding will usually result in double taxation.

For the reasons indicated, I respectfully dissent from the majority.