(March 5, 1886.)

## SETTLE ET AL. v. WINTERS ET AL.

### [10 Pac. 216.]

TIME ESSENCE OF CONTRACT.—While time is not necessarily of the essence of the contract in equity, yet it may be made so by the parties.

SAME—AS TO MINING PROPERTY.—Where the character of the property is such that it is liable to sudden fluctuation of value, time is of the essence of the contract. This rule is especially applicable to mining property.

APPEAL from District Court, Alturas County. Affirmed.

Bennett, Harkness & Kirkpatrick (Sutherland & McBride, of Counsel), for Appellants.

It is immaterial that the parties call the contract a lease if it shows a sale was intended. The intent is to be gathered from the whole instrument, and, when so ascertained, it is to be carried out, though the name given to it and particular clauses tend to show a different intent. (*Chase v. Bradley,* 26 Me. 531; *Merrill v. Gore,* 29 Me. 346; *Warren v. Merrifield,* 8 Met. (Mass.) 96; *District Tp. v. Dubuque,* 7 Iowa, 275; *Salmon Falls Mfg. Co. v. Portsmouth Co.,* 46 N. H. 249; *Heryford v. Davis,* 102 U. S. 235, 243, 244; *Nightingale v. Barens,* 47 Wis. 389, 2 N. W. 767; *Aqueduct Corp. v. Chandler,* 9 Allen, 167; *Miller v. Steen,* 30 Cal. 403, 89 Am. Dec. 124; *Diggle v. Boulden,* 48 Wis. 477, 485, 4 N. W. 678.) A covenant to convey on payment of a sum of money is binding, and will be specifically enforced on acceptance of the one to whom the

covenant is made, although, by the terms of the contract he does not bind himself to pay the money. (*Corson v. Mulvany,* 49 Pa. St. 88, 88 Am. Dec. 485; *Willard v. Tayloe,* 8 Wall. 557; *Ewins v. Gordon,* 49 N. H. 444; *Barnard v. Lee,* 97 Mass. 92.) It is enough that the parties have mutually agreed that their respective acts shall be done at or before a day named, or that the defendants' undertaking is in the form of a bond, and the condition requires certain acts to be done after or contemporaneously with some act to be done by the obligee. (*Steele v. Branch,* 40 Cal. 3; *Moote v. Scriven,* 33 Mich. 500; *Gibbs v. Champion,* 3 Ohio, 335; *D'Arras v. Keyser,* 26 Pa. St. 249; *Edgerton v. Peckham,* 11 Paige, 352; *Hall v. Delaplaine,* 5 Wis. 206, 68 Am. Dec. 57.) The vendor cannot tract default alone as terminating the contract, but he must give prompt and unequivocal notice, and make demand. (*Miller v. Steen,* 30 Cal. 403, 89 Am. Dec. 124; *DeCamp v. Feay,* 5 Serg. & R. 323, 9 Am. Dec. 372; *Edgerton v. Peckham,* 11 Paige, 352; *Leaird v. Smith,* 44 N. Y. 618; *Clark v. Lyons,* 25 Ill. 105.) Performance, or an offer to perform, is a condition precedent to the right of either party to insist upon performance by the other. (*Leaird v. Smith,* 44 N. Y. 618; *Crabtree v. Levings,* 53 Ill. 526; *Swan v. Drury,* 22 Pick. 485; *Warren v. Wheeler,* 21 Me. 484; *Howe v. Huntington,* 15 Me. 350.)

Richard Z. Johnson (Huston & Gray, of Counsel), for Respondents.

Where time is of the essence, the stipulation of the contract must be complied with. (Pomeroy's Specific Performance of Contracts, secs. 399, 401.) Parol is admissible to show that, at the time of the making of the contract, time was understood and considered to be of the essence of the contract. (*Nokes v. Kilmorey,* 1 De Gex & S. 444; *Thorington v. Smith,* 8 Wall. 1; *Stoops v. Smith,* 100 Mass. 63, 97 Am. Dec. 76, 1 Am. Rep. 85; *Sargent v. Adams,* 3 Gray, 72, 63 Am. Dec. 718; *Gerrish v. Towne,* 3 Gray, 82; *Almgren v. Dutilh,* 5 N. Y. 28.) Specific performance of a contract will not be decreed when there is a want of mutuality. (*Marble Co. v. Ripley,* 10 Wall. 340; *Kerr v. Purdy,* 51 N. Y. 629; *Magoffin v. Holy,* 1 Duvall, 95;

*Rogers v. Saunders,* 16 Me. 92, 33 Am. Dec. 635; *Green v. Covillaud,* 10 Cal. 330, 70 Am. Dec. 725.) One who is bound to convey on the payment to him of the purchase price of lands is not required to demand such payment, and may stand on the defensive until it is tendered to him, and cannot be deemed in default in the absence of such tender. (*Ten Eick v. Simpson,* 1 Sand. Ch. 250; *Goodale v. West,* 5 Cal. 339.) Where a vendee of land has obtained possession from the vendor under a contract of purchase, if he refuses to pay the purchase money, and accept the vendor's title, he must surrender the possession; and this, although the vendor has not a good title. (*Gilpin v. Watts,* 1 Colo. 479; *Tewksbury v. Magraff,* 33 Cal. 237; *Williams v. Morris,* 95 U. S. 455; *Peralta v. Ginochio,* 47 Cal. 460; *Sawyer v. Sargent* (Cal.), 7 Pac. 120.)

On the nineteenth day of September, 1882, the respondents, who are the plaintiffs herein, entered into a contract in writing with the appellants, who are the defendants herein, as follows: .

"This indenture of lease, with privilege of purchase, made and executed this nineteenth day of September, A. D. 1882, by and between G. F. Settle and Jacob Reeser, of Rocky Bar, Alturas county, Idaho territory, parties of the first part, and John Winkelbach, of said Rocky Bar, and John B. Winters and F. Ganahl, of the town of Hailey, I. T., parties of the second part, witnesseth: That the said parties of the first part, for and in consideration of one dollar to them in hand paid at and before the ensealing and delivery of these presents, the receipt whereof is hereby acknowledged, do hereby covenant and agree to and with the said parties of the second part, their heirs and assigns, as follows, to wit: The said parties of the first part, hereby grant, demise, and lease to the said parties of the second part the following described property, situate, lying, and being near Rocky Bar, Alturas county, I. T., to wit: All of that certain quartz lode mining claim known as the 'Vishnu,' and consisting of an undivided eight hundred feet; also all of that certain quartz lode mining claim consisting of fourteen hundred (1400) feet on that certain vein of quartz containing the precious metals known as the 'Idaho,' and being the discovery claims on said Idaho ledge; also twelve hundred

(1200) feet on the Golden or Sierra quartz lode; also twelve hundred (1200) feet more or less, on the Chauncy quartz lode or mine; also the 'Montana Tunnel' and tunnel right. All of the above mines and quartz lode claims commence at Quartz gulch, and run thence easterly toward Dixie gulch—the 'Vishnu,' eight hundred feet (800;) the 'Idaho,' fourteen hundred feet (1400;) the 'Sierra' or 'Golden,' 1,200 feet; and the Chauncy, 1,200 feet, more or less—and are situated on the north side of Bear creek, on Idaho hill. Also four hundred feet (400) in the Wizzard King quartz lode, commencing at Dixie gulch, and running westerly four hundred feet; also the millsite at the mouth of Quartz gulch, with blacksmith-shop and cabin thereon. All of the above-described property being situate at the upper end of Rocky Bar, in Bear Creek mining district, Alturas county, Idaho territory; the 'Vishnu' being highest on Idaho hill, and below it the Idaho, and next below the Golden or Sierra and the Chauncy, being all the group of mines on said Idaho hill south of Quartz gulch. Also that certain engine and boiler, known as the 'Idaho Engine and Boiler,' now lying on said Idaho millsite. From the twenty-seventh day of November, 1882, on the expiration of a certain lease of the Vishnu and Idaho mines, executed and delivered by the parties of the first part to Thomas Kitto, Charles Davey, and S. Parkinson; or, in the event of the assignment of said lease to the parties of the second part before the said twenty-seventh day of November, 1882, then from the date of such assignment until the twenty-seventh day of November, 1883, upon the following terms and conditions: The said parties of the second part, so long as they shall deem fit to hold said property, and to mine and extract ore there-from, and to pay the said parties of the first part one-half of the gross proceeds in manner hereinafter specified; and when the sum of forty thousand dollars ($40,000) shall have been paid, either out of the proceeds of the mine or other-wise, by the said parties of the second part to the parties of the first part—the said parties of the first part hereby covenant and agree, for themselves, their executors and administrators and assigns, to and with said parties of the second part, their heirs and assigns, to convey to them by good and sufficient deed

all of the above-described property, free and clear of all encumbrance, upon such payment, provided the said sum of forty thousand dollars ($40,000) shall have been paid on or before the twenty-seventh day of November, 1883. And the said parties of the second part hereby covenant and agree to enter upon said properties, and to mine and extract ore from the same so long as they shall find it profitable; to do the work in a proper and workman-like manner, and at their own cost and expense; and to hold and keep said property free and clear of all costs, charge, or lien for the working of the same; and out of the gross proceeds of said mines to pay one-half thereof, as fast as taken out, to said parties of the first part, in a manner hereinafter specified; and, upon the expiration of the term hereby granted, to surrender up the possession of said premises, with all the improvements, to the said parties of the first part, unless, on or before the said twenty-seventh day of November, 1883, the said sum of forty thousand dollars ($40,000) shall have been paid; and in the event of the said parties of the second part, or their assigns, failing to comply with either or any of the foregoing covenants, or any covenant, promise, or thing herein contained, on their part to be done, kept, or performed, that then it shall be lawful for said parties of the first part to re-enter, possess, and enjoy the above-described property and premises, and every part thereof; and the said parties of the second part hereby agree, in the event of such nonperformance on their part, to surrender possession of the said premises upon demand by said parties of the first part claiming their right to re-enter.

"It is hereby mutually covenanted and agreed by and between the parties to this instrument that the said parties of the first part shall have the right, at all times, of inspecting the said mines above described, and all mining operations and work thereon; that the said parties of the second part shall have the right, at any time, to stop work on said mines when they shall find or deem the same unprofitable; that, in working said ores, at each clean-up the said parties of the second part shall and will furnish a true account of all ores extracted and milled, and all bullion received, to the said parties of the first part; that, in milling said ores so taken from said property, the said

parties of the first part, if they so desire, shall have an equal right with said parties of the second part in milling the ores, cleaning and retorting the same, weighing and storing the bullion, until the said parties of the second part receipt to them for one-half the gross proceeds, it being expressly understood that upon each clean-up the said parties of the second part are to receipt to the said parties of the first part that they own one-half of the same, and that the said parties of the second part hold the same for them; and the said parties of the second part are then to dispose of the bullion to the best advantage, and to pay to the parties of the first part one-half of the proceeds thereof in money, currency, or coin; and upon such payment the parties of the first part will credit said purchase price of forty thousand dollars ($40,000) with the sum so received; and, lastly, that in no event shall the said properties above described, or any part thereof, be held for any claim, cost, charge, or lien for working the same by the said parties of the second part under this instrument, but that all such work shall be done at the expense of the said parties of the second part solely and alone; and the said parties of the first part, for themselves, their executors, administrators, and assigns, hereby covenant and agree, to and with the said parties of the second part, their heirs and assigns, to convey, by good and sufficient deed, all of the above-described properties, free and clear of all encumbrances, to them, the said parties of the second part, or their assigns, at any time, upon the payment to them, the said parties of the first part, of the sum of forty thousand dollars ($40,000) either out of the proceeds of the mines or otherwise, on or before November 27, 1883, in the manner hereinbefore specified by the said parties of the second part, or their assigns. And it is hereby expressly and mutually covenanted and agreed that this covenant shall be taken, held, and deemed a covenant real, running with and binding the land. In witness whereof the said parties have hereunto set their hands and seals this nineteenth day of September, 1882.

(Signed)    "GEO. F. SETTLE.      [Seal]
                 "JACOB REESER.       [Seal]
                 "JOHN WINKELBACH.    [Seal]
                 "JOHN B. WINTERS.    [Seal]
                 "F. GANAHL.          [Seal]

"Signed, sealed, and delivered in the presence of
"SOL. NEWCOMER."

At the same time the following instrument in writing was executed by appellants and delivered to the respondents:

"We, the undersigned, in consideration of the execution and delivery to us of a certain lease with the privilege of purchase of the 'Vishnu' and 'Idaho' mines, and of other property, of even date herewith, by G. F. Settle and Jacob Reeser, hereby covenant and promise to have each and every man employed by us in working said mines to sign the following contract, viz: 'In consideration of my being employed by John Winkelbach, J. B. Winters, and F. Ganahl, the lessees of the "Vishnu," "Idaho," and other mines, I hereby covenant and agree to look alone to said lessees for my pay, and hereby waive all rights or claim that I may have in law or equity against the property, or the owners thereof, G. F. Settle and J. Reeser.'

"Witness our hands and seals this nineteenth day of September, 1882.

(Signed)    "F. GANAHL.
"JOHN WINKELBACH.    [Seal]
"JOHN B. WINTERS.    [Seal]

"Signed, sealed, and delivered in the presence of
"SOL. NEWCOMER."

Soon after the execution of this contract the defendants bought in the Kitto lease mentioned in the contract at an expense of about $5,000, and entered into possession of the properties, and began work thereon, and extracted a large amount of ore.

On the twenty-fourth day of November, 1883, the parties further agreed, in writing, as follows:

"In consideration of the extension of the time of the above instrument until and including December 27, 1883, we hereby consent and agree to take a deed for 1,367 and one-sixth feet of the Idaho ledge instead of 1,400 feet, as covenanted in the above instrument, and to pay interest at one per cent per month on the balance of the purchase money from now until December 27, 1883, or any time it is paid prior to that date.

"Witness our hands and seals this twenty-fourth day of November, 1883.

(Signed)   "F. GANAHL.

"JOHN WINKELBACH.

"JOHN B. WINTERS.

"In consideration of the above covenants, we hereby extend the time on the within instrument until and including December 27, 1883.

"Witness our hands and seals, this twenty-fourth day of November, 1883.

(Signed)   "GEO. F. SETTLE.        [Seal]

"By V. S. ANDERSON.

"J. REESER.        [Seal.]"

That prior to the twenty-seventh day of December, 1883, defendants paid over to plaintiffs $20,075.04, and on the twenty-ninth day of December, 1883, they paid over $948.96, making in all $21,024, as one-half gross proceeds of ore taken out before the twenty-seventh day of December, 1883; and they continued to work a portion of the said mines until the service of injunction in this action, on the eleventh day of February, 1884, the same having been commenced February 4, 1884. Defendants extracted ore from said mines during the time they worked it to the amount of over $42,000. It is claimed by the plaintiffs that they demanded possession of this property in dispute about the twenty-second day of January, 1884. This is denied by defendants. The trial court found that the demand was made.

The plaintiffs brought this action to restrain defendants from further interfering with the premises in dispute, and for an accounting. The defendants answer the same, and also file a cross-complaint, wherein, among other things, they allege the making of the contract; that the same was for the sale of the said premises; that a further extension thereof has been granted; that the same is still in force; and that they have exercised the option to purchase, and paid, as part purchase money thereon, the sum of $21,024; that they had paid out for the Kitto lease $5,000, and the further sum of $34,000 in working and improving the mine; that the defendants were

ready, willing, and desirous to complete the contract, and receive the deed, and pay the balance of the purchase money thereon, and had tendered the same to the plaintiffs; that plaintiffs are unable to comply with their part of the contract; that defendants had greatly enhanced the value of the property; that they had expended a large amount of money between the twenty-seventh day of December, 1883, and the commencement of this action; and ask for a specific performance of the contract so far as plaintiffs were able; and that they be enjoined from interfering with the property.

The plaintiffs answer the cross-complaint, and, among other things, deny that defendants exercised any option to purchase. They allege that the work done by defendants was on the "Vishnu" mining claim; deny that defendants have expended a greater sum than one-half the net proceeds of the ore taken out; deny the enhancing of the value of the mine; and allege that defendants have taken from the mine ore of the value of $45,000. Plaintiffs aver that the money paid by defendants was for rent or royalty, under the terms of the lease, and not otherwise, and is less than one-half of the proceeds of ores taken out. Plaintiffs deny that the option to purchase has in any manner been extended beyond the twenty-seventh day of December, 1883; and allege that all work done after said date was by the wrongful act of the defendants, and without plaintiffs' consent; and allege that on the twenty-second day of January, 1884, they demanded possession of the property. They allege that they were ready, able and willing at all times, up to the twenty-eighth day of December, 1883, to comply with the terms of the contract; and that defendants knew plaintiffs' title at the time of making the contract. Plaintiffs further allege that the contract was drawn by one of the defendants, Frank Ganahl, who was an attorney of this court; that there was no other attorney that could be procured; and that said Ganahl represented, promised and claimed that time was of the essence of the contract; that if the whole sum of $40,000 was not paid at the expiration of the contract, then defendants would quit, and surrender up possession of the premises; and that he had full knowledge of plaintiffs' title.

The case was tried by the court, and, upon findings of fact and conclusions of law duly filed, judgment was entered in

favor of the plaintiffs, from which defendants appeal to this
court.

HAYS, C. J.—This case has been prepared with great care,
and presented with marked ability on each side.  It is conceded
that the contract upon which this action is based was drawn by
one of the defendants, who is a lawyer; that there was no other
attorney present, or to be procured, at the time and place where
it was drawn.  Our first duty is to ascertain what the parties
themselves meant and understood by the terms of this instru-
ment; for if the intention is plain and clear, we ought, if pos-
sible, to give force and effect to their intent.

Reading this contract, then, in the light of surrounding cir-
cumstances, as they existed at the time of drawing and execut-
ing the same, we think it must be construed to be a lease with
an option to purchase.  Did not the defendant who drew the
contract so understand it?  If not, did he not intend that the
plaintiffs, who are unlearned in the law should?  If he did not
intend that the plaintiffs should so understand it, why did he
begin the instrument, "This indenture of lease with privilege
of purchase"?  Again, the words are used, "grant, demise and
lease."  Then, the usual reservations of a lease are found—that
the parties of the first part shall have the right to inspect the
mines at all times.  "The parties of the second part agree to
enter upon said properties and extract ore so long as they shall
deem it profitable."  They are to do the work in a proper and
workman-like manner, to keep the property clear of all liens for
working the same, and to pay one-half of the gross proceeds of
the mine, as fast as taken out, to the parties of the first part;
and "upon the expiration of the term 'hereby granted,' to sur-
render up the said premises, with all the improvements, unless
on or before the twenty-seventh day of November, 1883, the said
sum of $40,000 should have been paid"; and, "upon failure
to comply with any covenant, promise, or thing therein con-
tained by the parties of the second part, to re-enter, take pos-
session," etc.

True, the contract provides that the parties of the first part
shall credit the said purchase price of $40,000 with the sum
so received, and there are terms used that might be construed

into a contract of sale. But in construing a contract it is contrary to well-settled rules to give it a narrow and technical interpretation, based upon some particular word or clause. The intent must be gathered from an examination of the instrument as a whole, and all clauses made consistent, if possible.

At the time of making the contract, and as a part of the transaction, the appellants executed and delivered to respondents the agreement in writing drawn by defendant Ganahl, in which they mention the contract as a "lease with the privilege of purchase," and they also describe themselves as "lessees." Under the circumstances, how must the respondents have considered the contract, and what did the appellants intend to have them understand? We think the natural interpretation of the words used indicates the intention of the respondents to lease the premises in dispute to appellants, and to give to them the right or option to purchase, at any time during the life of said lease, upon the payment in full of the amount agreed upon. It seems to us that it must have been so understood by all the parties. While time is not necessarily of the essence of the contract in equity, yet it may be made so by the parties themselves, or by the circumstances of the case. (3 Parsons on Contracts, 383; 1 Pomeroy's Equity Jurisprudence, sec. 455; *Green v. Covillaud,* 10 Cal. 317, 70 Am. Dec. 725; *Utley v. Lumber Co.,* 59 Mich. 263, 26 N. W. 488.)

Waterman, in his work on the Specific Performance of Contracts, says: "Courts of equity formerly paid but little attention to the mere time of which the stipulations of a contract were to be performed, and carried the doctrine of relief, notwithstanding a want of punctuality, to an extravagant length." "But the tendency of the modern decisions is to bring the doctrine within such moderate bounds as seem clearly indicated by the principles of equity, and by a reasonable regard to the common accidents, mistakes, infirmities and inequalities belonging to all human transaction." (Waterman on Specific Performance of Contracts, sec. 456.)

Equity usually treats time as originally of the essence of the contract when the agreement shows that the parties intended that it should be so regarded. (Waterman on Specific Performance of Contracts, secs. 459, 460; Pomeroy's Specific Per-

formance of Contracts, secs. 399, 401; *Grey v. Tubbs,* 43 Cal. 362; *Benedict v. Lynch,* 1 Johns. Ch. 370, 7 Am. Dec. 484; *Wells v. Smith,* 7 Paige, 22, 31 Am. Dec. 274, and note; Willard's Equity Jurisprudence, 294; *Phelps v. Railroad Co.,* 63 Ill. 468.)

This rule seems to be well settled, and perhaps the more difficult question for solution now before us is whether time, in this case, has been made essential. The contract provides that it shall run until the twenty-seventh day of November, 1883. It further provides for a conveyance, provided the sum of $40,000 shall have been paid on or before the twenty-seventh day of November, 1883. It further provides that upon the expiration of the term hereby granted, to surrender up the possession of said premises, with all the improvements, to the said parties of the first part, unless, on or before the said twenty-seventh day of November, 1883, the said sum of $40,000 has been paid. Again, by the terms of the extension of November 24th, which are: "In consideration of the extension of the time of the above instrument for thirty days, or until and including December 27, 1883"—it would seem that the parties understood and intended to make time essential; for the respondents extend the time until and including December 27, 1883. Each party is specific in fixing the limit of time. Then, again, we may be aided in reaching a correct conclusion by an examination of the character of the property. Real estate is less stable in this country than in England, hence our courts have been more liberal in extending the rule and allowing the special facts and circumstances of each case to have a more controlling influence. Time is usually regarded as of the essence of the contract, both in England and America, where the character of the property renders it liable to fluctuations in value. (Pomeroy's Specific Performance of Contracts, sec. 385; Waterman on Specific Performance of Contracts, sec. 460; Fry on Specific Performance of Contracts, secs. 713, 718; *Green v. Covillaud,* 10 Cal. 330, 70 Am. Dec. 725; *Jennisons v. Leonard,* 21 Wall. 302; *Goldsmith v. Guild,* 92 Mass. 239; *Christie's Appeal,* 85 Pa. St. 463.)

Fry on Specific Performance of Contracts, section 716, says: "The nature of all mining transactions is such as to render time essential; for no science, foresight or examination can

afford a sure guaranty against sudden loss, disappointment and reverses; and a person claiming an interest in such an undertaking ought, therefore, to show himself in good time willing to partake of the possible loss as well as profit." The same, in substance, has been stated by many other authors. (Waterman on Specific Performance of Contracts, sec. 460; Pomeroy's Specific Performance of Contracts, sec. 385, and note; Willard's Equity Jurisprudence, sec. 292.) We think this a wise rule, and that it should be adhered to, especially in a mining country like ours.

It is claimed by the appellants that respondent Reeser extended the time after the twenty-seventh of December, 1883. The trial court found that no such extension had been made, and the evidence abundantly sustains this finding.

It is also claimed by the appellants that no demand was made upon them by respondents for the possession of the mine. The trial court found the demand was made, and we think the evidence preponderates in favor of the finding.

The appellants offered payment in full, in June, 1884; but this being made long after the commencement of the action, and more than five months after the time limited by the parties for such payment, we think, cannot be available for the reasons heretofore stated.

It has been urged with great force that in this case appellants have paid to plaintiffs more than one-half of the agreed price; but it must be remembered that this was all from the moiety of ore, or from the proceeds thereof, stipulated to be paid, and must be treated as royalty or rent for the use of the mine. We think, in the case at bar, a different rule should govern than what would be applied in an ordinary sale of real estate. For then, usually, the value of the realty remains the same; and if the grantor is permitted to retain both payment and realty, great injustice might be done. But in the case at bar each ton of ore taken out depletes the mine so much, and in this case it has been exhausted to the amount of over $42,000. But it is claimed that the appellants have worked the mine at great loss. By the terms of the contract they were at liberty to abandon the work whenever they should deem it unprofitable. Surely

it will not be claimed that equity can be invoked to relieve a party from the result of a bad bargain alone.

Many other questions have been discussed, and many points urged by appellants, and, after a careful consideration of them all, we deem it unnecessary to discuss them at length, as we find no error.

Taking into consideration the contract as we construe it, the evident intent of the parties, the nature and character of the property in dispute, we think the conclusion is irresistible that time is of the essence of the contract, and that a court of equity, with all its great and varied power, cannot decree a specific performance in this case.

Judgment is therefore affirmed.

Broderick, J., concurring.

BUCK, J., Dissenting.—Conceding, for the present, that the contract in question is a lease with the option to purchase, when does the lease go into operation, and when is the option to purchase exercised? It seems to be mutual. It is signed by both parties, and each covenants to do certain acts. As a lease it was partly executed when the defendants entered into possession of the mine. Until the option to purchase was exercised the defendants held as lessees. Whenever they exercised that option by the terms of the instrument they held as vendees. A sale is a contract whereby the ownership to property is transferred. The sale is completed when the possession and title pass from vendor to vendee. In the case at bar the possession was in defendants, but under the lease the title remained in the plaintiffs, the lessors. When the option to purchase was exercised the title passed from the lessors to the lessees, and their relation changed from lessors and lessees to vendors and vendees. The lessees having possession under an agreement to purchase, at a purchase price of $40,000, the title passed whenever they exercised their option by paying the purchase price, or any part of it. By the terms of the contract all money paid to the plaintiffs was to be credited on the purchase. Whenever, therefore, a credit was so made, a part of the purchase price was paid, and I apprehend the option to purchase was exercised.

We cannot call this payment royalty or rent, because, to do so, would contradict the express provisions of a sealed instrument. After the purchase this contract, which, up to that time, had operated as a lease, became, in its legal effect, a mortgage to secure the payment of the unpaid purchase price.

It is said that under the terms of this instrument the defendants could abandon the venture at any time. This provision enables us to appreciate the importance of that provision which makes the money paid purchase price. To induce defendants to continue the venture, and not abandon it, the plaintiffs stipulate that every dollar paid shall be a credit in payment of the mine. Can we say after, under this inducement, the defendants have expended a large amount of money, and paid plaintiffs more than half the amount of the purchase price, that the plaintiffs may alter or disregard the express covenant which has been the inducement to defendants' outlay, and say this $21,000 which you have paid us is only rent—you have not yet paid us any part of the purchase money—you have never exercised your option to purchase? It is claimed that time is of the essence of this contract. The general rule for the purchase of land is that time is not of the essence of the contract. It is claimed, however, that mining property constitutes an exception. Certain text-writers are quoted as sustaining this exception. An inspection of these references, however, gives us but two or three ancient English cases. No American cases are cited. If this exception is established by adjudication, it is remarkable that upon this coast, in the forty years of mining, no such has been adjudicated.

The terms used in the contract specifying the time at which the entire purchase price should be made, and when the plaintiffs might re-enter, cannot be said to determine that time is of its essence; for much stronger language has been adjudicated as meaning differently. Conceding, however, for the argument, that this exception exists in the case of mere options for the purchase of mining property, the question remains, Is this contract simply an option? It is admitted that it is unusual in its terms, conditions and covenants, and that it is difficult to construe. If we attempt to construe it on the theory that it is simply a lease, with an option to purchase, the terms used

will be unnecessary and confusing. If we consider, however, the circumstances of the parties and the property at the time the contract was executed; that, as seems established by undisputed testimony, the plaintiffs wished to sell and the defendants to buy; that nothing whatever was said of leasing the property, and that the word was first used in the contract itself; and interpret this instrument with the light which these circumstances afford—we may understand the contract to be, what it is alleged to be, more than a mere option to purchase; that it was intended to secure the defendants in an anticipated large expenditure of money, and to enable them to secure the fruit of their labor by finally obtaining the title to the property; and also to secure the plaintiffs, through the covenants to re-enter, against the loss of any portion of the purchase price. If, indeed, it is conceded that it is generally understood by miners that time is of the essence in the mere option to purchase mines, that fact may account for the unusual covenants in the contract, and indicate that they were intended to guard against that very construction, and protect the defendants against it.

In addition to these considerations, in considering the relief sought by plaintiffs in enjoining defendants from occupying the disputed premises, we should remember that the plaintiffs covenant in the contract to give defendants a deed, free and clear of all encumbrances, of the premises in dispute. It is admitted that at the time when they claim the $40,000 should have been paid, and at the time this action was commenced, the property was, and as far as appears is yet, encumbered by a mortgage of at least $7,000. It is alleged that, after the alleged termination of the lease, demand was made of defendants for the premises. Was a mere demand sufficient? Should not that demand have been accompanied with an offer to fulfill on their part? This action to enjoin defendants and dispossess them of the premises is, in effect, an action for specific performance against defendants. The plaintiffs rely upon the strict letter of the law. They who seek equity must do equity, and I think the rule applies that a party who seeks specific performance must first be prepared to do equity. This the plaintiffs have never done. It is said

that the amount of this encumbrance might have been deducted from the contract price; that the plaintiffs intended to pay this encumbrance out of the purchase price. The defendants were not required in the contract to provide for this encumbrance, nor to pay before it was discharged. Over $21,000 had already been paid, and yet the encumbrance of $7,000 was unprovided for.

Are the plaintiffs in position to invoke this hard relief against defendants when they have never offered to perform, and have never been in a condition to fulfill, on their part? I think the suggestion that this encumbrance might have been provided against by retaining its amount by defendants is not tenable. This would involve a new contract; plaintiffs claim under the written one set out in the complaint. It is suggested that defendants' tender of the balance due, made six months after the time when the lease terminated, is too late. I think equity will regard the plaintiffs' action as asking for specific performance of the contract, as they allege it to be, and defendants' cross-complaint in response thereto as setting up and praying specific performance, as they understand the contract; that the defendants' tender is made responsive to plaintiffs' demand, and is sufficient in time. I think this view is fully sustained by the authorities cited upon the argument, but I have not the time to classify them. For these reasons I cannot assent to the opinion of the court.