(No. 6554.   March 8, 1939.)

B. F. KLOPPENBURG, Respondent, v. JAMES W. MAYS, C. P. HOWES, and F. L. GREENE, Appellants.

[88 Pac. (2d) 513.]

Fisher & Coffin, for Appellants.

Hawley & Worthwine, for Respondent.

AILSHIE, C. J.—This is an appeal from a judgment of rescission of a contract of sale and purchase of a mining claim.

Respondent, a bachelor, native of Boise county, had resided in Boise basin for more than seventy years. He had engaged in all kinds of mining and was the owner of the Golconda, a quartz mining claim located in the Moore's Creek Mining District, and also owned a half interest in two other mining claims, the Golconda No. 2 and the Nevada. Respondent knew appellant Howes all his life and had known Greene for eight or ten years. Howes was the owner of some placer claims below the Golconda property, "in the same gulch." Greene was living about four miles from the Golconda mine in June, 1930. About that time he stayed at respondent's camp, helping respondent clean out a shaft, and later locating a claim of his own to which respondent had directed him, using respondent's tools. From that time until the fall of 1936 very little development work was done on the Golconda.

It is contended by respondent that Howes and Greene, during the summer of 1936, trespassed on the Golconda claim and discovered a vein or outcropping of ore which averaged from $40 to $100 per ton in value; that the trespass and discovery was not known by respondent until May, 1937. The Howes and Greene property is "possibly a mile and a

half'' from the Golconda property. Mays and Howes looked at the Golconda property and Howes and Greene suggested that Mays "might get that property, and suggested that they would like to have an interest in it." Mays, a stranger to respondent, thereafter went to respondent and negotiated for an option on the Golconda claim, representing that he wanted to secure a lease and option for "a bank or banker of Portland, Oregon." When questioned by respondent, Mays represented that Howes and Greene would have no interest in the lease or option.

After going over the matter somewhat in detail and discussing the price, the manner of making monthly instalment payments, the amount of development work that should be done and the execution and delivery of a deed in escrow with the First National Bank of Boise, they prepared, executed and acknowledged a written instrument, embodying their contract. They did not employ anyone to write the contract for them but used a printed form of "Title Bond and Lease of Mining Property" in common use in the mining region and wrote in the blank places the specific terms of their agreement. No question arises here that any mistake was made in drafting the contract or that anything was left out through fraud or mistake that was to be inserted. The contract as completed is as follows:

## "TITLE BOND

"KNOW ALL MEN BY THESE PRESENTS, That B. F. Kloptenburg of the County of Boise, and State of Idaho, is held and firmly bound unto James W. Mays in the penal sum of One Thousand Dollars lawful money of the United States, for the payment of which sum well and truly to be made we hereby bind ourselves, our heirs, administrators and assigns, firmly by these presents. Witness his hand and seal the first day of October A. D. 1936.

"The conditions of the Above Obligations are such, That whereas the above bounded party of the first part, on the day of the date hereof have agreed to sell to the said party of the second part the following described property, to-wit: THE GALCONDA QUARTZ MINING CLAIM LOCATED ON SUNSET RIDGE, HEAD OF THE NORTH FORT

OF THE HAY FORK CREEK, MOORES CREEK MINING DISTRICT, BOISE COUNTY, IDAHO the locations and bounds of said property being marked and described more particularly in the Location Certificate or Patent thereof, recorded in Book 26 on page 488 of the Records of Quartz mining claims, County of Boise said property being situated in Moores Creek mining District, in the County of Boise and State of Idaho for the sum of $8334/no cents——Dollars. which said sum of money is to be paid to the said party of the first part, or deposited to his credit in the Idaho First National Bank of Boise, Idaho in the manner following, to-wit:

"Ten Per cent (10%) royalty on the net proceeds of the sale or reduction of the ore on or from said property and commencing on December 1st, 1936 said second party guarantees to said Kloptemburg that the monthly royalty shall be at least twenty Five ($25.00) Dollars for each and every month thereafter and if said royalty does not equal $25.00 per month, then said second party will pay and makes it a part of this agreement to pay said Kloptemburg the sum of $25.00 each and every month commencing on said December first, 1936 and continuing during life of this contract and said $25.00 payment shall be paid personally to or be deposited in the Post Office and addressed to said Kloptemburg at Idaho City, Idaho or any other address he gives.

"And the said party of the first part shall, within 60 days from the date hereof make, execute and acknowledge unto the said party of the second part, a good and sufficient deed of all the foregoing property showing a clear and perfect title, free from all incumbrance (except as against the United States) which said deed shall be deposited within 60 days from the date hereof, in the said Idaho First National Bank of Boise, Idaho in escrow, to be delivered to the said party of the second part, or his assigns, on the payment in full of the aforesaid purchase money.

"THE FURTHER CONDITIONS OF THE BOND ARE, FIRST—The said party of the second part, or his assigns, shall be placed in full and peaceable possession of said property, to mine, remove and sell ore therefrom.

"Second, That the said party of the second part, or his assigns, shall before the First day of October, 1937, expend the sum of Five hundred ($500.00) Dollars in the development and improvement of said property.

"Third, That the said party of the second part, of his assigns, shall during the continuance of this Bond, deposit in the said Idaho First National Bank of Boise to the credit of the said party of the first part Ten Per Cent (10%) of the proceeds of all ore taken from said property, after deducting all the expenses incurred. And said sum so deposited shall be a part payment of the said purchase money.

"Fourth, second party shall have all water and timber rights that belong to said property, said purchase price must be paid on or before five years from date hereof in full.

"Now, if the said party of the second part of his assigns, shall fail to comply with the aforesaid conditions, or any of them and and if the said party of the first part shall well and faithfully perform the covenants herein, then this obligation to be null and void, otherwise to remain in full force and effect.

"B. F. KLOPPENBURG (Seal)
"JAMES W. MAYS (Seal)

"Acknowledged by B. F. Kloppenburg and James W. Mays before Katherine M. Brogan, Clerk District Court, Boise County, Idaho. I hereby certify that this instrument was filed for record at the request of B. F. Kloptenburg at 30 minutes past 9 o'clock A. M. this 2nd day of October, A. D. 1936, in my office and duly recorded in Book 10 of Misc. at page 40.

"ALICE WILLIAMS
"Deputy Recorder."

The gist of the complaint consists in the charge that the appellants "entered into a fraudulent conspiracy among themselves" and, acting together "in furtherance" thereof, did the following things:

"(a) That on or about the 15th day of September, 1936, the said James W. Mays approached the plaintiff, B. F. Kloppenburg at Idaho City, Idaho, and asked him for an

option upon said Golconda Mining Claim, and *represented to the said plaintiff* that he, the said Mays, was securing said lease and option for a bank or banker of Portland, Oregon, who was financially responsible, who had a good reputation for truthfulness, and whose honor and integrity had never been questioned, and that if the said option were secured that the said bank or banker in Portland, Oregon, would conduct active mining operations upon said mining claim and would strictly account to the plaintiff for all royalties earned on ore or bullion extracted from said mining claim, all *of which representation was false,* fraudulent and untrue and known to the said James W. Mays and the other defendants to be false, fraudulent and untrue, and was made for the express purpose of causing the plaintiff herein to rely upon the same, *and that said representations were material* in inducing the plaintiff to enter into the contract and lease hereinafter set forth; *plaintiff believed the same to be true and relied* on them and without their having been made would not have entered into said contract and lease.

"(b) That in furtherance of said *conspiracy,* the said James W. Mays, when questioned by the plaintiff and asked whether the said James W. Mays was representing C. P. Howes and F. L. Greene, or either of them, directly or indirectly, or was in any way connected with them, repeatedly represented to the said plaintiff that he had nothing whatsoever to do with the said C. P. Howes and F. L. Greene, or either of them, and that the said C. P. Howes and F. L. Greene did not have and neither of them would have any interest in said option, provided he, the said plaintiff, would give it to the said James W. Mays, all of which representations and statements made by the said James W. Mays to the plaintiff were false, fraudulent and untrue and known to be untrue by the said James W. Mays, and which statements the said Frank Kloppenburg relief upon as being true at the time he gave the hereinafter described option to the said James W. Mays; that said statements were material and had they not been made the plaintiff would not have entered into said contract.

"(c) That in negotiating for the amount to be specified in said bond and option, *which was $8,334.00 and the five* year period of time in which the same was to be paid, the said James W. Mays *represented to the plaintiff that he would receive at least $25.00 a month regardless of whether* the said claim produced any net royalty or not, and that he would not retain possession any longer than it took to prove whether the mine was good or had any valuable ore in it. That at the time of making said representation, the said James W. Mays knew that the said defendants, C. P. Howes and F. L. Greene had made a valuable discovery of a lead or outcropping of ore upon said mining claim of the value *of from $40.00 to $100.00 per ton,* which lead or outcropping indicated a rich deposit of high grade ore, but the said *James W. Mays did not reveal to the said plaintiff the said new discovery,* but *fraudulently concealed* said discovery from the plaintiff by representing that he did not know whether said mine had *any valuable ores in it,* upon which representation plaintiff relied, and had said defendant not fraudulently concealed said discovery said plaintiff would not have entered into said contract and lease herein referred to." (Italics supplied.)

The court found the foregoing facts as alleged.

Numerous assignments of error have been made but they all go to the sufficiency of the facts plead and proven to entitle the respondent to a rescission of the contract, and for that reason we shall discuss the sufficiency of the facts as found to entitle respondent to the relief awarded by the trial court.

An agreement between two or more persons, to do or accomplish something which is in itself lawful and does not contemplate or employ any unlawful means for its consummation, and which does not injure or damage the prospective victim (so called), is not actionable. Such an agreement is *not a conspiracy* for the reason that an agreement can become a *conspiracy only* when it has for its purpose the doing or *accomplishing* something that is *criminal or unlawful,* or some lawful thing in an unlawful manner.

(Black's Law Dict., 3d ed., p. 409; Funk & Wagnall's Unabridged Dict.; 11 Am. Jur., p. 543, sec. 3.)

It was lawful for any one or all of the appellants to deal with and purchase mining claims of respondent if he could do so. It was likewise lawful for any one or all of them to purchase this property, if he could do so, through the medium of any one of the others or through someone else. It was the equal right of respondent to refuse to deal with any one or all of the appellants; and if he chose to deal with one only, he had a right *to bind that one* to not transfer the contract in whole or part to the others or either of them. In pursuance of such right, it appears that he told Mays that he would not deal with either Howes or Greene and that Mays assured him that he would not have anything to do with either of the objectionable parties. They then proceeded to reduce their contract to writing and in doing so repeatedly referred to Mays "and his assigns" as being either obligors or obligees for various and sundry things but nowhere provided against assignment to Howes, Greene or anyone else.

Now it is plain, upon the face of the contract, that it recognized and permitted *assignment*. Moreover, it is the character of contract, dealing with mining ground as it does, that is, in the usual and ordinary course of mining property transactions, the subject of assignments and transfers in order to finance or operate (or both) such properties. In the usual course of business in mining regions, brokers and promoters "tie up" mining prospects and claims by securing options, leases and "bonds" on the claims so as to have something tangible to offer to the man who is to do the financing or the work or both in developing the property, to the extent of demonstrating whether it contains sufficient paying mineral deposits to justify the outlay for its purchase, development and operation.

It must be conceded, for the purpose of this consideration, that Mays misstated the facts to respondent when he told respondent that Howes and Greene had nothing to do with the transaction, and would not be in the deal and that, on the contrary, an honest Portland banker would handle and finance the deal. It must be conceded, too, that this conduct

was unethical and untruthful; but it was neither criminal nor unlawful, nor was it a *material representation or consideration* for the contract. The nature of the contract and the subject matter were such that the falsehood in this respect could not and did not injure or damage respondent in any respect. So long as the payments are made and the other terms of the contract are complied with, it is wholly immaterial whether the purchaser is rich or poor, honest or dishonest. A false representation which causes no loss is not actionable. (*Van Buren v. Posteraro,* 45 Colo. 588, 102 Pac. 1067, 132 Am. St. 199, 201; *White v. Kincaid,* 149 N. C. 415, 63 S. E. 109, 128 Am. St. 663, 23 L. R. A., N. S., 1177; *Adler v. Fenton,* 24 How. (U. S.) 407, 16 L. ed. 696, 697.)

Here Mays took from respondent an option on the Golconda claim and agreed to pay $8,334 for the claim in instalments of at least $25 per month, and at the end of five years to pay all unpaid balance of the purchase price; and in the meanwhile he was to do $500 worth of development work within one year and pay respondent 10 per cent of the net receipts from all ores extracted.

It is not contended that the appellants have failed or in any manner refused to live up to the terms of the contract. The monthly payments have been made and the required amount of development work has been done. Respondent has not suffered any financial damage or loss. His whole injury appears to lie in the shock to his mental equanimity on finding Howes and Greene interested in the option and the resultant fear that he may in some way be "gypped" by them. Respondent's testimony on this is elucidating:

"A. I thought it was a good deal, too, until this thing came up.

"Q. You still think it's a good deal, don't you?

"A. If they go ahead and don't gyp me, which they have tried hard enough to do.

"Q. How do you know they have gypped you?

"A. I don't know whether they have, or not; they are trying awful hard.

"Q. In what way have they tried?

"A. (No answer.)

"Q. You got the money?

"A. Yes, I got the money; it went to the bank to my credit.

"Q. From the first of December until May?

"A. Yes.

"Q. You got each successive $25.00 as it came in; that was placed to your credit; is that correct?

"A. I did as long as it come, until the last one.

"Q. And the last one was not placed to your credit because you forbade the bank to accept it?

"A. I did.

"Q. So the contract, so far as that part was concerned, was fully performed by the defendants?

"A. It was.

"Q. Now, is there any part of the contract that is not fully performed by these defendants at this date?

"A. (No answer.)

"Q. Do you claim these people are in default in any respect in regard to that contract?

"A. (No answer.)

Mr. FISHER: Well, I would like to have you answer!

"Q. (By Mr. FISHER.) You know whether they have kept the terms of their contract, don't you?

"A. I don't consider they have kept their contract.

"Q. (By Mr. FISHER.) Now, where haven't they kept their contract?

"A. They haven't developed it as they should have done.

"Q. What requirement did you have as to development and improvement of the claim?

"A. He was supposed to go ahead and sink a shaft of 102 feet, which they haven't done, . . . .

"Q. Wait a minute; was there anything in that contract that he was to sink 102 feet of shaft?

"A. It should have been if it wasn't in . . . .

"Q. When Mr. Mays read it to you, did he read that there was 102 feet of shaft to be done? Did he read that to you?

"A. Well, he was to sink a 102 feet shaft.

"Q. He read that to you, at the time that you signed the contract?

"A. (No answer.)

"Q. You didn't examine the contract, yourself?

"A. No, I just took his word for it.

"Q. You took the word of an entire stranger he was going to sink 102 feet of shaft; is that right?

"A. I guess it was right . . . .

"Q. (By Mr. FISHER.) In what way has this contract that you have signed resulted to your disadvantage, Mr. Kloppenburg?

"A. (No answer.)

"Q. How have you been injured or damaged because of the execution and delivery of this contract of October 1, 1936?

"A. *Well, I don't know as I have been damaged any, but I didn't like his turning it over to Howes and Greene.*

"Q. Yes, but how have you been damaged? Have you been damaged a cent because he assigned the contract to Howes and Greene?

"A. Yes, I know, but it doesn't make any difference; I didn't like it, and I didn't want to deal with them, and that's all that matters.

"Q. If you had made a contract with the devil and he had performed it, what difference would it have made?

"A. Well, I might have done that, too!

"Q. In other words, you weren't injured at all by the execution of that contract, except your feelings; you don't like it?

"A. *Outside of the feelings, they have done nothing; that's all.*

"Q. Well, they haven't injured you in a monetary way, have they?

"A. (No answer.)

"Q. They benefited you, didn't they?

"A. I don't know as they benefited me.

"Q. Well, you got $25.00 a month from them every month until you refused to accept it, didn't you?

"A. I got it from Mays; I never knew Howes and Greene was in the deal at all, until—

"Q. (By Mr. FISHER.) You accepted the money from time to time?

"A. I accepted the money until I found out it was from Howes and Greene; I thought it came from Portland Bank all the time. . . . .

"Q. Now, Mr. Kloppenburg, did you know—you have heard since it was discovered that Howes and Greene, after April 22d, had been on your property last summer, trespassed on it,—you have heard they said it?

"A. *I have heard they said it; I don't know it; I have never been up there to find out.*

"Q. (By Mr. WORTHWINE.) And you have also heard they said they took out $3,000.00?

"A. Yes.

"Q. And did they ever account to you for any royalty?

"A. No." (Italics supplied.)

It is the contention of respondent that a contract, like the one here involved, "brings about a relation of particular trust and confidence between the parties, particularly where a net royalty is paid," etc., and that by reason of such trust and confidence respondent "entered into said lease which failed to contain the following usual provisions for leases and bonds entered into in Boise County, Idaho:

"(a) A provision making time of payment of the royalty and the performance of other conditions of the essence.

(b) That the lessee furnish to the lessor a copy of all mint or smelter returns or that the ore or bullion be shipped in the name of the owner as well as the lessee.

(c) That the lessor be given the privilege of inspecting all the books, records, papers and documents relating to the mining enterprise conducted by the lessee.

(d) That the lessee be given the right through himself or through an agent to inspect the mining operations conducted upon said mining claims.

(e) That a provision that all work done or performed upon said mining claims should be done in a good and miner-like manner."

Mays was a stranger to respondent at the time this contract was entered into. Respondent had never seen Mays before

the day he came up to respondent's place to negotiate for the contract here involved. Under no theory or stretch of imagination can it be said any confidential or trust relation arose or existed between him and respondent *until after the contract had been executed*. But here it is urged that the foregoing provisions, quoted in (a) to (e), both inclusive, were omitted from this contract because of respondent's "trust and confidence" in Mays, although no contention whatever is made that respondent, at the time, wanted or offered to incorporate such provisions in the written contract or that Mays prevented or dissuaded him from doing so; nor is. it even suggested that he thought of or wanted any such provisions in the contract *when it was executed.* On the other hand, the contract is neither uncertain nor ambiguous and therefore no reason appears for resorting to custom in Boise county mining circles or elsewhere as to provisions usually inserted in such contracts. (*Gramkow v. Farmers Coop. Irr. Co.,* 47 Ida. 578, 277 Pac. 431, and cases cited; also, *Ehlinger v. Washburn-Wilson Seed Co.,* 51 Ida. 17, 1 Pac. (2d) 188.) *They did not contract with reference to any custom;* they reduced their contract to writing in simple, well-understood terms.

Now, adverting for the moment to the provisions (a) to (e), inclusive, which it is claimed custom required but were omitted from the contract, let us see just what this omission, if omission it be, amounts to. In the first place, as stated in 3 Lindley on Mines, p. 2125, "The authorities . . . . recognize that where mines or mining property are the subject of the contract, time is of the essence, independent of any express stipulation inserted in the instrument." (*Settle v. Winters,* 2 Ida. 215, 225, 10 Pac. 216; *Durant v. Comegys,* 3 Ida. 204, 213, 28 Pac. 425; *Waterman v. Banks,* 144 U. S. 394, 12 Sup. Ct. 646, 36 L. ed. 479; Morrison's Mining Rights, 16th ed., 346.) So, also, will a court of equity grant relief where it is necessary for the landlord to enter and inspect property or obtain information as to the ore and minerals being extracted; and in case of royalty contracts the court would afford such relief and make such affirmative orders as will fully protect the lessor or landlord. In other words,

a court of equity, when its aid is invoked, will as fully protect respondent, under his contract as written, as it could do if the provisions specified had been inserted in the contract.

This court has uniformly held, for a long period of years, that in order to entitle litigants to affirmative judgments for relief, in cases of alleged fraud, the ''fraudulent representations'' must have been ''of a *material* fact for the purpose of inducing plaintiffs to enter into the contract'' and that ''they must show affirmatively by preponderance of evidence that they have been *injured* thereby.'' (*Breshears v. Callender*, 23 Ida. 348, 361, 131 Pac. 15, 20, 22; *Smith v. Johnson*, 47 Ida. 468, 472, 276 Pac. 320.)

Equity will not do for a litigant that which he had the power to do and could have done for himself and declined or neglected to do when the choice and opportunity was his to protect himself. (*Jensen v. McConnell Bros.*, 31 Ida. 87, 169 Pac. 292; *Ehlinger v. Washburn-Wilson Seed Co.*, 51 Ida. 17, 1 Pac. (2d) 188.)

''Fraud which would relieve a party who can read must be fraud which prevents him from reading.'' (*West v. Prater*, 57 Ida. 583, 594, 67 Pac. (2d) 273, 277.)

Judge Elliott in *Meyer v. Yesser*, 32 Ind. 294, says: ''Fraud without injury is never available as a defense in equity.'' For the same reason it is not a tenable basis on which to predicate a complaint for relief in equity.

In support of respondent's contention, that he was entitled to a disclosure of the names of the parties with whom Mays was dealing, he cites *Cohn v. Knabb*, 105 Wash. 363, 177 Pac. 794, and insists that ''it is directly in point'' on this case. Cohn and Knabb, competitors in the merchandise business, within a few doors of each other, were unfriendly. A third person approached Knabb asking to purchase his store and saying that he was representing an undisclosed principal. Knabb told the party that he would not enter into a contract if Cohn had anything to do with it. The prospective purchaser assured Knabb that Cohn had no interest in the transaction; whereas, as a matter of fact, the party was purchasing for Cohn as principal. On learning of the interest of Cohn, Knabb rescinded the contract and

Cohn sought specific performance. The court declined to enforce specific performance, saying:

"It will be noticed that the consummation of the sale under this contract involved something more than the mere delivery of the business and the stock and receiving an agreed fixed price therefor, since, by the terms of the contract, Cohn would have the privilege of participating with Knabb in making an invoice of the stock, and thereby in a measure cause interference with Knabb's business before consummation of the sale, with the possibility of Cohn still refusing to purchase, as to which Knabb would be dependent upon the good faith and ability of Cohn to purchase.

" . . . . It may be that Knabb took his chances as to who the undisclosed principal was for whom Cohn was acting, other than *Cohn, but this is not so as to* Cohn." (Italics supplied.)

No such condition exists here. Under this contract it was merely a question of the optionee or purchaser making the payments and complying with the contract. No choice or discretion was left to be exercised by anyone.

In line with the principles adopted in the Cohn-Knabb case, *supra,* courts have held that, where a man takes an order for goods, representing that he is appearing for the manufacturer, and sends the order in to another manufacturer, specific performance will not be ordered, because there may have been some substantial reason why the purchaser would want the goods of the one manufacturer and not want the goods of the other. (*Fox v. Tabel,* 66 Conn. 397, 34 Atl. 101.) In other cases specific performance has been refused for similar reasons. It should be remembered, in this connection, that courts of equity will refuse to order specific performance in a case of this character where, upon the same facts, they would not order a rescission of the contract. (12 R. C. L., p. 306, sec. 67; 25 R. C. L., p. 205, sec. 5, n. 9.)

It has been urged here that Howes and Greene trespassed on respondent's mining claim and discovered a rich vein of ore and told Mays of their discovery, and that Mays concealed the information from respondent who was unaware of the discovery. It is admitted that Mays did not tell re-

spondent of any discovery and, although denied, it may be that the evidence was sufficient to support the finding that Howes and Greene did trespass on the claim and make a discovery of some ore that had not previously been exposed. It is clear, however, that Mays, who was not and never had been an employee of respondent, was under no duty to apprise respondent, who had owned the property for many years, of the ore bodies in his own claim; and although Howes and Greene committed a technical trespass on the claim, it is nevertheless common knowledge that miners do and are expected to go onto undeveloped and unworked mining claims, for purposes of inspection and discovery if possible of the probable value of such claims, and to determine whether they are worth anything. It is only reasonable to assume that no one would enter into a contract to purchase an undeveloped mining claim or prospect without ever having been on it in person or by agent and having made some investigation as to its possibilities for development into a mine. In such cases the owner must know, or at least assume, that the prospective purchaser has been on and inspected the claims in some manner and to some extent.

The judgment will be reversed and the cause is remanded to the trial court with directions to dismiss the action. Costs awarded to appellants.

Morgan and Holden, JJ., concur.

Petition for rehearing denied.

GIVENS, J., Dissenting.—The ground for reversal in the majority opinion is that to support rescission of a contract for fraud in its inception, pecuniary injury must be shown and that herein none was shown.

Of the three cases cited in the opinion on this proposition *White v. Kincaid*, 149 N. C. 415, 63 S. E. 109, 128 Am. St. 663, 23 L. R. A., N. S., 1177, was an action by a minority stockholder to enjoin the majority from winding up and dissolving the corporation; *Van Buren v. Posteraro*, 45 Colo. 588, 102 Pac. 1067, 132 Am. St. 199, was a suit to restrain the enforcement of a judgment and remove it as a cloud on

plaintiff's real estate, and *Adler v. Fenton,* 24 How. (U. S.) 407, 16 L. ed. 696, was an action to set aside an assignment as an alleged fraud on plaintiff, creditor of the defendant. Thus none of the three involved rescission.

While there is authority to the effect that there can be no recovery on the ground of fraud unless injury is shown, the definitive rule with regard to rescission is that while it is necessary to show injury in an action for damages for fraud—and a distinction is made between an action for specific performance and for rescission—action for rescission will lie though no pecuniary damage is shown. (26 C. J. 1171, sec. 79; 58 C. J. 970, sec. 154; 13 C. J. 610, sec. 651; *Everson v. J. L. Owens Mfg. Co.,* 145 Minn. 199, 176 N. W. 505; 66 C. J. 565, sec. 117.)

"Counsel for plaintiff in error urge that, in order to establish fraud, actual pecuniary damages must be pleaded and proven, and that, inasmuch as the plaintiff's pleadings and proof failed in this respect, the judgment of the trial court must be reversed. The general rule is announced in 39 Cyc. 1254, as follows:

" 'The general rule is that a vendor or purchaser is not entitled to rescind the contract because of the other party's fraud or misrepresentation, unless he has been damaged or prejudiced thereby. But it is not always necessary to show actual pecuniary damages. It is enough for him to show that he has been otherwise prejudiced, as that he has been induced by material false representations to enter into a contract which he would not have entered into but for such representations.' " (*Conrad v. Darnell,* 114 Okl. 48, 242 Pac. 772, 773.)

"Appellant's contention that the representation was not material is likewise unconvincing. The test of materiality is that the contract sought to be rescinded would not have been made if the representation had been absent. *Colton v. Stanford,* 82 Cal. 351, 399, 23 Pac. 16, 16 Am. St. 137; *Craig v. Shea,* 45 Cal. App. 351, 354, 188 Pac. 73." (*Shirreffs v. Alta Canyada Corp.,* 8 Cal. App. (2d) 742, 48 Pac. (2d) 55, 58.)

"It is urged . . . . that the plaintiff suffered no damage because of this misstatement of fact and that this action cannot, therefore, be maintained. Attention is called to the well-recognized rule that damage or prejudice must be shown to maintain an action for fraud; . . . . that fraud without damage or damage without fraud is not actionable. *Urtz v. New York Cent. & H. R. R. Co.*, 202 N. Y. 170, 95 N. E. 711, and kindred cases laying down this rule are cited. These cases were brought to recover damages for deceit, where the defrauded party elected to affirm the contract and sue for the loss sustained, and where the measure of damages would be the difference in value of the article sold and what it would be had it been as represented . . . . this is not an action to recover damages for deceit, but is brought upon a rescission of the contract to recover the consideration paid . . . . Under these circumstances, appellant was not bound to ·show that it had suffered pecuniary loss by reason of defendant's fraud." (*Commercial Credit Corp. v. Third & LaFayette Sts. Garage*, 226 App. Div. 235, 234 N. Y. Supp. 463, 468.)

"It is urged that the complaint does not state a cause of action because (a) it does not allege that plaintiff has suffered pecuniary loss. . . . .

" (a) Is it essential to the statement of a cause of action for rescission of a contract for fraud that the plaintiff allege that he has suffered pecuniary loss? . . . .

. . . . . . . . . . . . . .

"It is axiomatic in the law that, if it is necessary to allege a particular fact, it is equally necessary to prove it, if the allegation is put in issue. It certainly could not be said that it would be sufficient for plaintiff to allege that as a result of the fraud he suffered damage 'in an appreciable amount' or suffered 'material damage' or 'substantial damage.' Any one of these allegations would render the pleadings subject to demurrer under section 6534 of our Codes. If it is necessary to allege pecuniary loss it is necessary to allege the amount of such loss; but section 6532 Revised Codes, provides, 'if the recovery of money or damages be demanded, the amount must be stated,' and this provision is exclusive. *'Expressio unius est exclusio alterius.'* This is not an action

for the recovery of money or damages, and therefore it is not necessary to allege that plaintiff suffered pecuniary loss.

"Courts of equity, like courts of law, however, do not concern themselves with wrongs which do not produce injury; but 'injury' and 'pecuniary loss' are not synonymous terms. In *Shoudy v. Reeser*, 48 Mont. 579, 142 Pac. 205, this court stated the rule that, to make out a case of actual fraud, it is necessary for plaintiff to allege: (1) That defendant made representations with the intent that they should be relied upon; (2) that they were false; (3) that by reason of the fraud plaintiff suffered damage. These are the elements recognized by the authorities generally. Most of the courts and text writers employ the term 'damage' in the sense of injury; a few restrict its meaning to financial loss. We prefer to adhere to the rule which gives to the term its broader significance as including either pecuniary loss or the alteration of one's position to his prejudice. Fraud may result in injury which cannot be measured in dollars and cents. . . . ." (*Stillwell v. Rankin*, 55 Mont. 130, 174 Pac. 186, 187.)

*Barcus v. Dorries*, 64 App. Div. 109, 71 N. Y. Supp. 695, was an action brought to recover for certain books sold to defendant by an agent of plaintiff who falsely represented and induced defendant to believe that he was purchasing the books from a committee of the United States Congress. The court held that defendant had a right to repudiate the contract:

"Under those circumstances, we think it was entirely immaterial that he got the precise books which he bargained for, and that they were in every way as valuable as if they had been the property of the Committee on Distribution, and sold by such committee to him. The principle which is controlling in this case, and which prevents a recovery by the plaintiff is stated in the case of *Arkansas Valley Smelting Co. v. Belden Min. Co.*, 127 U. S. 379, 8 Sup. Ct. 1308, 32 L. Ed. 246 as follows: 'But every one has a right to select and determine with whom he will contract and cannot have another person thrust upon him without his consent.' "

See also: *Boston Ice Company v. Potter*, 123 Mass. 28, 25 Am. Rep. 9. It is likewise argued that the doing of a law-

ful thing in a lawful way is not actionable even though it may result in injury to another, citing *White v. Kincaid, supra.* The *non sequitur* is that the appellants here were not doing a lawful thing in a lawful way but a lawful thing (i. e., buying the Golconda) in an unlawful way (i e., by deceit) and I do not think the court should on such specious reasoning place its stamp of approval on fraud and misrepresentation. The trial court's findings of fraudulent material representations are amply supported by appellants' own admissions.

True the contract did not provide against assignment as it could have done but that does not do away with the fact that Mays made false statements, that he knew they were false, that they were made for the purpose of inducing respondent to enter into the contract and that had respondent known the true facts he would not have made the contract. It was his substantial legal right to contract with Mays and not with Greene and Howes. "The voice is Jacob's voice, but the hands are the hands of Esau," Gen. XXVII, 22.

To allow rescission of the contract restores respondent to possession of his property. Mays, Howes and Greene, of course lose the advantage of their bargain, but they were the ones who committed the fraud, they were the ones that brought about the unfair situation, and properly protected as to their expenditures, it seems to me respondent should not be held to have appealed in vain to a court of equity. "Truth (should not be) forever on the scaffold, wrong forever on the throne." "The Present Crisis," Lowell.

While the trial court found that the work of appellants was of no value I think the evidence does not support him. The only evidence of value of the tunnel, outside of conclusions, was that given by appellant Howes who valued it at $10 per foot, and Penrod, witness for respondent, at $6 per foot.

The judgment should be affirmed upon respondent paying to appellants $575 (work done by appellants) with interest thereon from the date respondent refused to accept further payments under the contract.

Budge, J., joins in this dissent.